UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

THOMAS R. WIETERS, MD; JOHN
DOE, and others similarly situated,
            *Plaintiffs-Appellants,*

v.

ROPER HOSPITAL, INCORPORATED, a/k/a
CareAlliance Health Services, d/b/a
Roper Care Alliance; CARE
ALLIANCE HEALTH SERVICES,
INCORPORATED; CHIP NARAMORE;
SALLY DOE,

            *Defendants-Appellees.*

No. 01-2433

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
C. Weston Houck, District Judge.
(CA-01-2082-2-12)

Argued: December 5, 2002

Decided: February 27, 2003

Before WILKINSON, LUTTIG, and MICHAEL, Circuit Judges.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Donald Edward Jonas, COTTY & JONAS ATTOR-
NEYS, Columbia, South Carolina, for Appellants. James Joseph Hin-

chey, Jr., HINCHEY, MURRAY & PAGLIARINI, L.L.C., Charleston, South Carolina, for Appellees. **ON BRIEF:** Mary J. Murray, HINCHEY, MURRAY & PAGLIARINI, L.L.C., Charleston, South Carolina, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

Dr. Thomas R. Wieters, the plaintiff-appellant, is a surgeon in Charleston, South Carolina, and was until recently a member of the staff at Roper Hospital, Inc., a private non-profit institution. This case stems from Roper Hospital, Inc.'s suspension of Dr. Wieters's privileges in response to what the hospital terms his "disruptive behavior." When Dr. Wieters sued Roper Hospital, Inc. and related defendants (collectively, "Roper" or "the hospital") over his suspension, Roper raised as a defense the immunity granted to hospitals under the Health Care Quality Improvement Act (HCQIA), 42 U.S.C. § 11101 et seq. The district court granted summary judgment to the hospital on immunity grounds, and we affirm.

I.

Sometime prior to January 1999 Roper became affiliated with CareAlliance Health Services, Inc. Thereafter, according to Dr. Wieters, there was a decline in the quality of patient care at Roper. Dr. Wieters frequently expressed his dissatisfaction in an angry and disruptive manner. No specific incidents are described in the record provided to us, but at oral argument in district court, Dr. Wieters conceded the accuracy of an affidavit calling his behavior disruptive. The administration at Roper became aware of this conduct and initially attempted what it calls "collegial intervention." When this did not solve the problem, the hospital in January 1999 appointed an ad hoc committee to conduct a formal inquiry.

In July 1999 the ad hoc committee interviewed Dr. Wieters, who was not allowed to have counsel present or to call witnesses. The committee made recommendations to the Medical Executive Committee (MEC). An affidavit from Dr. Steven Shapiro, president of the Medical Staff at the hospital, refers to a letter from Dr. Samuel Hazell, chair of the ad hoc committee, that takes a harsh view of Dr. Wieters's behavior, although the letter itself is not in the joint appendix. A document that appears to be the minutes of the ad hoc committee's interview of Dr. Wieters suggests that he had some reason to be angry or frustrated about patient care at the hospital, though it deems his reactions "inappropriate."

Following Dr. Wieters's interview with the ad hoc committee, the MEC had a hearing, at which Wieters appeared. According to Wieters (but undocumented in the appendix), the MEC included at least one doctor who was Wieters's "economic competitor." On October 18, 1999, the MEC placed Wieters on probation, requiring that he fulfill various conditions, including seeing a psychiatrist and ceasing his disruptive behavior. On November 15, 1999, Wieters requested a hearing on the MEC's probation decision. The Roper bylaws provide for this hearing, which appears designed to meet the requirements of the HCQIA, discussed below. The hospital was apparently slow in responding to the hearing request, because on December 29, 1999, Wieters's then-lawyer wrote to the hospital reiterating the request. As of January 6, 2000, the hospital still had not answered. On that date, in response to new disruptive incidents by Dr. Wieters that violated the conditions imposed by the MEC, the hospital summarily suspended his clinical privileges. A summary suspension is authorized by the hospital bylaws to "safeguard and protect patient welfare or to protect the best interests of the Hospital." Wieters immediately requested a hearing on the summary suspension. The hospital in its initial reply agreed to schedule a hearing, but referred only to his previous request for a hearing on the MEC's probation decision, not to the summary suspension.

Dr. Wieters subsequently received notice that a second ad hoc committee had been formed to consider the summary suspension. The notice included a description of the hearing procedure, the membership of the committee, and a list of witnesses. The committee held an evidentiary hearing on January 28, 2000, at which Dr. Wieters was

represented by counsel. The second committee also included one or more of Dr. Wieters's economic competitors, but this time he expressly waived any objection on this ground. Before the hearing, in a non-binding recommendation to the MEC, the second ad hoc committee concluded that summary suspension was an inappropriate sanction. Following the hearing, the MEC voted to lift the summary suspension on the condition that Dr. Wieters voluntarily discontinue the use of his privileges until he had seen a psychiatrist and had begun anger counseling. The conditions were to be met within thirty days. Dr. Wieters agreed on February 4, 2000, and the summary suspension was lifted.

There followed a dispute about the parameters of Dr. Wieters's agreement to the conditions. The parties disagreed about whether Dr. Wieters's voluntary relinquishment of privileges was to be reported to the National Practitioners Database (NPDB). Apparently, such a report would have severe professional consequences for Dr. Wieters, although neither side has described them for us. Dr. Wieters believed that he had agreed to the conditions on the understanding that such a report would not be made, while the hospital claims to have made no such commitment. The parties further disagreed over the selection of the psychiatrist. When Dr. Wieters failed to fulfill the conditions within thirty days, the hospital reported the voluntary relinquishment to the NPDB. Dr. Wieters than rescinded his relinquishment, and the summary suspension went back into effect. It remains in place, apparently.

Dr. Wieters sued the hospital in South Carolina court, asserting that the suspension violated his rights under state law and the federal constitution. When the hospital removed the case to federal court, Dr. Wieters voluntarily dismissed his federal claims. The district court exercised its discretion to retain jurisdiction over the state claims because the hospital asserted a defense under the HCQIA, leaving state and federal issues intertwined. At a hearing on July 31, 2001, the district court asked the parties whether a November trial date would be too soon. Dr. Wieters's lawyer replied, "The sooner, the better." At the urging of the district court, the parties agreed to pursue mediation. The court said it would "schedule the case for discovery," although no scheduling order was ever entered. A trial was set for early November 2001. In the several months following the July hear-

ing, the parties engaged in intense mediation and then went into discovery, which triggered certain motions to compel and for protective orders. In October 2001 Dr. Wieters's second lead counsel withdrew, leaving co-counsel in charge. The hospital moved for summary judgment in early October, and a few days before the hearing on that motion, Dr. Wieters requested an extension of time to respond. Without ruling on Dr. Wieters's motion for more time, the district court granted summary judgment for Roper. This appeal followed.

## II.

Dr. Wieters raises several issues on appeal. We first address his arguments alleging procedural errors in the district court, and then we move to his argument that the court improperly granted summary judgment to Roper on the ground that it was immune from Dr. Wieters's suit under the HCQIA.

## A.

Dr. Wieters contends that the district court failed to adhere to the provisions of Fed. R. Civ. P. 16(b), 56(f), and 41(a). Wieters's complaints mainly concern his attempt to get more time to respond to the motion for summary judgment.

## 1.

Dr. Wieters first objects because the district court did not enter a formal scheduling order even though Fed R. Civ P. 16(b) says that the district court "shall" enter such an order. Wieters's argument overlooks what the district court did to manage his case. The court allowed discovery to proceed and scheduled an early trial date at Dr. Wieters's request. In addition, the court promptly scheduled hearings on motions as required. In our view, the absence of a formal scheduling order did not prevent the orderly development of the case.

## 2.

Roper filed its motion for summary judgment on October 4, 2001. On October 24 Dr. Wieters filed a "Motion to Extend Time To Fur-

ther Respond To [Defendants'] Motion For Summary Judgment." We construe this as a motion under Fed. R. Civ P. 56(f), which provides that summary judgment proceedings should be continued when the party opposing summary judgment "cannot for reasons stated present by affidavit facts essential to justify the party's opposition . . . ." The district court never explicitly ruled on the motion. Instead, it granted summary judgment to Roper after a hearing on November 2, 2001. The grant of summary judgment was an implicit denial of the Rule 56(f) motion, and we review that denial for abuse of discretion. *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 362 (4th Cir. 1996).

A party must support a Rule 56(f) motion by "specifying which aspects of discovery required more time to complete," *Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir. 1995), and how the facts developed in that time will be useful in resisting summary judgment. *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 245-46 (4th Cir. 2002); 11 James Wm. Moore et al., Moore's Federal Practice, ¶ 56.10[8][d] (3rd ed. 2000). Although no affidavit accompanied Dr. Wieters's motion, that is not necessarily fatal. *Harrods*, 302 F.3d at 244-45. The motion sought an extension (and more time to complete discovery) because (1) valuable time had been consumed in a lengthy mediation process, (2) there had been only a short time allowed for discovery, and (3) there had been some difficulties in dealing with the opposing side. But neither the motion nor any of the other motions filed simultaneously give any hint of what additional facts might have been gained through more discovery or how such facts might have helped Dr. Wieters carry his burden in opposing summary judgment. The motion for more time does refer to a memorandum filed in support, but we assume it would not be helpful to us on this issue because it has not been included in the joint appendix. On the record before us, we cannot say that the district court abused its discretion in implicitly denying Dr. Wieters's motion for an extension of time.

3.

Dr. Wieters further argues that the district court, as an alternative to entering summary judgment against him, should have dismissed his complaint without prejudice under Rule 41(a). Wieters filed a Rule 41(a) motion for voluntary dismissal on October 22, 2001, shortly before the scheduled trial date. We review the denial of a motion for

voluntary dismissal for abuse of discretion. *Davis v. USX Corp.*, 819 F.2d 1270, 1273 (4th Cir. 1987); *Paturzo v. Home Life Ins. Co.*, 503 F.2d 333, 335 (4th Cir. 1974). In deciding a Rule 41(a) motion, a district court should consider the following, nonexclusive factors: "[T]he opposing party's effort and expense in preparing for trial, excessive delay and lack of diligence on the part of the movant, . . . insufficient explanation of the need for a dismissal, . . . [and] the present stage of litigation." *Phillips USA, Inc. v. Allflex USA, Inc.*, 77 F.3d 354, 358 (10th Cir. 1996) (internal citations and quotation marks omitted). Here, it is unclear which side is responsible for Dr. Wieters's inability to complete discovery in time, although it should be noted that his lead counsel withdrew rather late in the game. It is unquestioned, however, that he assented to, even encouraged, the compressed discovery schedule. This, coupled with the lateness of his motion for a voluntary dismissal and his failure to explain why such a dismissal would be of benefit to his case, provides ample justification for the district court's decision. The court did not abuse its discretion in denying Dr. Wieters's motion for a voluntary dismissal.

## B.

The district court granted the hospital summary judgment on the ground that its actions were immunized from suit by the HCQIA. Dr. Wieters challenges this decision. The HCQIA provides that "professional review bodies," and their members and staff, taking "professional review actions" "shall not be liable in damages" under state or federal law, as long as the actions satisfy certain conditions. 42 U.S.C. § 11111(a)(1). There is no controversy in this case that the Medical Executive Committee is a professional review body. A professional review action is one that is "based on the competence or professional conduct of an individual physician" and "affects . . . adversely" the physician's clinical privileges. 42 U.S.C. § 11151(9). The enumeration of issues presented in Dr. Wieters's brief includes the question of whether the summary suspension was a "professional review action," but he does not argue the issue in the brief. Thus, the only substantive question before us is whether Roper fulfilled the Act's requirements and earned its immunity. To be protected by the HCQIA, an action must be taken:

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a).

There is a rebuttal presumption that professional review actions have met these standards. *Id.* This creates an unusual summary judgment standard. A plaintiff suing over such an action must prove that the action failed to fulfill the statute's requirements. Thus, the defendant is entitled to summary judgment unless "a reasonable jury, viewing all facts in a light most favorable to [the plaintiff], could conclude that he had shown, by a preponderance of the evidence, that [the] action[ ] fell outside the scope of section 11112(a)." *Gabaldoni v. Washington County Hospital Assoc.*, 250 F.3d 255, 260 (4th Cir. 2001).

Dr. Wieters challenges Roper's fulfillment of two of these requirements. He claims that the action was taken not in the reasonable belief that it would further quality care, but to halt his complaints about the declining standards of care at the hospital. He further claims that the process by which he was suspended was not fair and did not comply with the requirements of the Act.

Dr. Wieters does not contest the evidence of his outbursts and ill treatment of nurses. To bolster his claim that he was fired because he was a whistleblower, he submits evidence that conditions at the hospital were substandard. This evidence is irrelevant. Regardless of the merit of his complaints, the hospital presents uncontested evidence that he expressed them in a disruptive and unprofessional manner. The hospital relies on the affidavit of Dr. Steven Shapiro, president

of the Medical Staff at the hospital. The affidavit notes that Wieters engaged in seventeen instances of "disruptive conduct," but gives no specifics. It quotes Dr. Samuel Hazell, the chair of the first ad hoc committee, generically describing Wieters's "paroxysm[s] of rage" and "unprofessional behavior." It is not difficult to see that the hospital would be justified in the belief that this conduct was detrimental to the quality of the health care it provided.

Dr. Wieters presents his own evidence from Dr. Hazell. In a letter to the psychiatrist selected to consult with Dr. Wieters, Dr. Hazell complained about the process by which his committee made its inquiry, and he wrote that Wieters is a good physician. In his brief Dr. Wieters refers to a statement in which Dr. Hazell says that the process was the result of a vendetta against Wieters, but it is not clear whether this evidence was in the summary judgment record. In any case, Dr. Wieters's evidence is far from sufficient to overcome the presumption in favor of the hospital. A reasonable jury could not conclude that Dr. Wieters has shown by a preponderance of the evidence that Roper was motivated to take its action by something other than the reasonable belief that suspending him would improve health care at the hospital. *Cf. Clark v. Columbia/HCA Info. Servs.*, 25 P.3d 215 (Nev. 2001) (denying HCQIA immunity to defendants when plaintiff had expressed concerns about standards of care in a nondisruptive manner, by making disclosures to outside authorities).

Dr. Wieters's challenge to Roper's compliance with § 11112(a)(3), the procedural requirement, is essentially that the hospital failed to follow its own bylaws. Nothing in the HCQIA makes immunity depend on adherence to bylaws, though the act does include a "safe harbor" provision, 42 U.S.C. § 11112(b). If a hospital follows the procedures laid out in § 11112(b), it is deemed to have satisfied § 11112(a)(3). *Id.* The Roper bylaws are designed to match the safe harbor provisions. Even if the procedure employed to handle Dr. Wieters's dispute strayed from the letter of the bylaws, however, it still meets the immunity requirements if it was "fair to the physician under the circumstances." 42 U.S.C. § 11112(a)(3). Dr. Wieters argues that he never received a hearing on his probation, because the January 2001 hearing concerned the summary suspension. He also argues that although he waived his objection to the presence of economic competitors on the second ad hoc committee, it was improper

for the MEC, which made the ultimate decision on his suspension, to include such competitors. Although Dr. Wieters has pointed out parts of the process that did not hew strictly to the bylaws and the safe harbor provisions, he has presented nothing that would lead a reasonable jury to find by a preponderance of the evidence that the hospital treated him unfairly under the circumstances.

Overall, Dr. Wieters failed to rebut the presumption of the HCQIA that the hospital complied with its requirements. Roper is therefor immune from damages suits relating to Dr. Wieters's suspension, and the district court properly granted the hospital summary judgment on all of Dr. Wieters's claims for damages.

## C.

Two of the claims in Dr. Wieters's complaint were for injunctive relief. He pursued these claims before the district court, which denied his request for a preliminary injunction, dissolved a restraining order put in place by the South Carolina court, and appeared to have granted summary judgment as to the equitable claims. Although Dr. Wieters's appellate brief notes in passing that the HCQIA does not provide immunity against claims for equitable relief, he never argues that summary judgment was improper as to those claims. We therefore conclude that his claims for injunctive relief have been abandoned. *Cf. Imperial v. Suburban Hosp. Assoc., Inc.*, 37 F.3d 1026, 1031 (4th Cir. 1994) (claim for injunctive relief never prosecuted in district court is abandoned).

\* \* \*

The judgment of the district court is affirmed.

*AFFIRMED*