OPINION
{¶ 1} Dr. Paul Moore ("Dr. Moore") appeals the November 23, 2001 judgment entry of the Trumbull County Court of Common Pleas granting summary judgment in favor of Dr. Jeffrey Rubin ("Dr. Rubin") and Western Reserve Care Systems ("WRCS") (together "the defendants"). For the reasons set forth below, we affirm the decision of the trial court in this matter.
 {¶ 2} Dr. Moore has been on staff at WRCS since 1983. Dr. Moore was an active member of the cardiothoracic and vascular surgery practices at WRCS. In 1993, WRCS hired Dr. Rubin as chairperson for the Department of Surgery. As such, Dr. Rubin had the authority to monitor the performance of all individuals with clinical privileges.
 {¶ 3} As a "teaching hospital," WRCS trains recent medical school graduates in various areas, including surgery. As director of WRCS's General Surgery Residency Training Program, Dr. Rubin had the authority to determine which physicians would participate, as faculty, in the training program. A physician with clinical privileges is not granted the right to participate in the program.
 {¶ 4} Because of high mortality rates for open heart procedures performed at WRCS during 1993 and 1994, local primary physicians and cardiologists began referring potential heart surgery patients to other hospitals outside WRCS's area. As a further result of WRCS's high mortality rates, Anthem Insurance, WRCS's largest private insurance payer, excluded WRCS's open heart surgery program from coverage.
 {¶ 5} WRCS subsequently appointed a task force to examine the open heart surgery program. After conducting a study of the program, the task force recommended numerous changes to the open heart surgery program. After implementing the task force's recommendations, WRCS still experienced a high mortality rate in 1995. The continued problems with the open heart surgery program caused WRCS to experience a dramatic decline in the volume of surgeries performed at WRCS.
 {¶ 6} In 1996, Dr. Moore's negligent treatment of a child, which caused the death of the child, resulted in the summary suspension of Dr. Moore's privileges at WRCS on November 1, 1996. WRCS conducted a review of the matter as required by WRCS's bylaws. On December 6, 1996, Dr. Moore's privileges in cardiothoracic surgery were reinstated, while his vascular surgery privileges remained suspended. Dr. Moore's vascular surgery privileges were permanently suspended on January 8, 1997. After numerous hearings, including Dr. Moore's appeal of the suspension, Dr. Moore's privileges were fully reinstated and a letter of reprimand was issued to Dr. Moore on August 7, 1997. The letter informed Dr. Moore that Dr. Rubin would be "closely monitor[ing] and periodically review[ing] [Dr. Moore's] professional activity."
 {¶ 7} During the review of Dr. Moore, and because of WRCS's continued problems with its open heart surgery program, WRCS contracted with a renowned group of cardiothoracic surgeons based at Allegheny General Hospital (the "Magovern Group"). In August 1997, based upon the conclusions reached during Dr. Moore's review, Dr. Moore was denied participation in the surgery training program. The surgery training program was later restricted to those physicians in the Magovern Group.
 {¶ 8} In May 1998, all surgeons at WRCS were reviewed for the appointment and re-appointment of all physicians. During the review, it was revealed that Dr. Moore experienced six more surgical mortalities. On September 29, 1998, 13 of the 16 members of the Professional Executive Committee ("PEC") voted to deny the re-appointment of Dr. Moore. After conducting a hearing on the matter, Dr. Moore ultimately was re-appointed and another letter of reprimand was issued on June 9, 1999. The letter again informed Dr. Moore that Dr. Rubin would closely monitor and review Dr. Moore's actions, "with specific attention to any cases involving a mortality or unexpected adverse outcome."
 {¶ 9} After receiving statistical data regarding 1999 operative results at WRCS, which indicated that Dr. Moore performed only five heart operations and that Dr. Moore experienced an operative mortality rate of 75%, Dr. Rubin recommended to the Vice President of Medical Affairs that Dr. Moore's privileges be suspended to ensure the quality of care at WRCS. In accordance with WRCS's bylaws, Dr. Rubin also referred these cases to the Patient Care Committee for further review. After conducting a meeting, the PEC directed that Dr. Moore's activities would continue to be "closely monitored with specific attention to further negative outcomes."
 {¶ 10} On September 1, 1999, Dr. Moore filed a complaint against the defendants for tortious interference with business relationships and defamation, and against WRCS for breach of contract. On October 20, 2000, Dr. Rubin filed a motion for summary judgment. On March 23, 2001, WRCS also filed a motion for summary judgment. Dr. Moore dismissed his defamation claim on April 30, 2001. The trial court conducted a hearing on the motions for summary judgment on May 3, 2001.
 {¶ 11} On November 26, 2001, the trial court granted summary judgment in favor of the defendants. Dr. Moore timely appealed and raises the following assignments of error:
 {¶ 12} "[1.] The trial court erred in granting summary judgment in favor of the Hospital and Dr. Rubin on Dr. Moore's claim for tortuous interference with business relationships.
 {¶ 13} "[2.] The trial court erred in granting summary judgment in favor of the Hospital on Dr. Moore's breach of contract claim."
 {¶ 14} In his first assignment of error, Dr. Moore argues that the defendants intentionally and improperly interfered with his business relations without privilege to do so. Dr. Moore argues that neither Dr. Rubin nor WRCS were protected by the Health Care Qualified Immunity Act ("HCQIA") for their actions which prompted the within lawsuit. Dr. Moore also claims that some of the defendants' actions were not taken as part of the peer review process and, as such, would not be protected under the HCQIA.
 {¶ 15} We will first address WRCS's actions in contracting with the Magovern Group and in granting the Magovern Group exclusive access to one of the operating rooms, which were not part of any peer review process. Summary judgment is appropriate when there is "no genuine issue as to any material fact [and] * * * reasonable minds can come to but one conclusion," which is adverse to the nonmoving party. Civ. R. 56(C). In reviewing a motion for summary judgment, the court must construe the evidence in favor of the nonmoving party. Id. Moreover, an appellate court conducts a de novo review of the trial court's decision to grant summary judgment. Doe v. Shaffer, 90 Ohio St.3d 388, 390,2000-Ohio-186.
 {¶ 16} "The elements essential to recovery for a tortious interference with a business relationship are: (1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom. * * * The basic principle of a `tortious interference' action is that one, who is without privilege, induces or purposely causes a third party to discontinue a business relationship with another is liable to the other for the harm caused thereby. * * *." Wolf v.McCullough-Hyde Mem. Hosp., Inc. (1990), 67 Ohio App.3d 349, 355
(internal citations omitted).
 {¶ 17} "[H]ospital governing boards are responsible for upgrading the standards of health care to be maintained in a hospital." Khan v. Suburban Community Hosp. (1976),45 Ohio St.2d 39, 45 (citation omitted). In doing so, a hospital board has the right to contract with medical groups to provide service to the hospital, including the right to grant a medical group exclusive rights. See Williams v. Hobbs (1983),9 Ohio App.3d 331, 335.
 {¶ 18} In this case, in light of the fact that WRCS was experiencing an excessive mortality rate in its open heart surgery program and a declining volume of such surgeries, it is clear that WRCS's action in contracting with the Magovern Group was for purposes of upgrading the standards of care at the hospital. Thus, arguably, WRCS's action in contracting with the Magovern Group was with privilege. Moreover, in so contracting, WRCS did not interfere with Dr. Moore's license to practice medicine. In fact, although WRCS promoted the Magovern Group in an effort to upgrade the hospital's standards, to decrease its mortality rates and to enhance the hospital's image, Dr. Moore, at the time of this appeal, maintained full clinical privileges. Finally, Dr. Moore failed to introduce any evidence to establish that WRCS's action caused any third party to discontinue a business relationship with Dr. Moore. WRCS's action in contracting with the Magovern Group, therefore, did not constitute tortious interference with Dr. Moore's business relations.
 {¶ 19} Likewise, WRCS's action in granting the Magovern Group exclusive access to one of the operating rooms does not rise to the level of tortious interference with business relations. As mentioned above, WRCS had the right to contract with the Magovern Group. Moreover, although Dr. Moore was not permitted to use one of the operating rooms, he did have access to the other operating rooms. WRCS's limitaion, therefore, did not preclude Dr. Moore from practicing medicine. Thus, WRCS's action in restricting Dr. Moore from using one of the operating rooms did not amount to tortious interference with Dr. Moore's business relations.
 {¶ 20} We now must examine the defendants' actions taken during the course of the peer review process. Because of the "increasing occurrence of medical malpractice and the need to improve the quality of medical care," Congress enacted the HCQIA "to provide incentive and protection for physicians engaging in effective professional peer review." Section 11101, Title 42, U.S. Code. The HCQIA provides immunity from damages to the "professional review body, * * * any person acting as a member or staff to the body, * * * any person under a contract or other formal agreement with the body, and * * * any person who participates with or assists the body with respect to the action," as long as the professional review meets certain standards. Section 11111(a)(1), Title 42, U.S. Code. Moreover, immunity is granted to those individuals "providing information to a professional review body regarding the competence or professional conduct of a physician * * * unless such information is false and the person providing it knew that such information was false." Section 11111(a)(2), Title 42, U.S. Code. "A professional review action shall be presumed to have met the [requisite] standards * * * unless the presumption is rebutted by a preponderance of the evidence." Section 11112(A)(4), Title 42, U.S. Code.
 {¶ 21} "[T]he rebuttable presumption of § 11112(a) creates a somewhat unusual standard [in reviewing motions for summary judgment]: Might a reasonable jury, viewing the facts in the best light for [the plaintiff], conclude that [the plaintiff] has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)?" Austin v.McNamara (C.A.9, 1992), 979 F.2d 728, 734 (citation omitted); see, also, Menon v. Stouder Mem. Hosp., (Feb. 21, 1997), 2nd Dist. No. 96-CA-27, 1997 Ohio App. LEXIS 567, at *7, citingBryan v. James E. Holmes Regional Med. Ctr. (C.A.11, 1994),33 F.3d 1318, 1333; Gureasko v. Bethesda Hosp. (1996),116 Ohio App.3d 724, 731 (citation omitted). Thus, "the presumption language in HCQIA means that the plaintiff bears the burden of proving that the peer review process was not reasonable."Bryan, 33 F.3d at 1333 (emphasis sic).
 {¶ 22} In reviewing a motion for summary judgment, "the nonmoving party may not rest on the mere allegations of his pleading, but his response * * * must set forth specific facts establishing the existence of a genuine triable issue." State exrel. Flagner v. Arko, 83 Ohio St.3d 176, 177, 1998-Ohio-127
(citation omitted). Mere unsubstantiated allegations are insufficient to adequately rebut the presumption that the peer review process was conducted according to the standards set forth in the HCQIA. See Smith v. Ricks (N.D.Ca. 1992),798 F.Supp. 605, 611-612.
 {¶ 23} In this case, the defendants' actions that Dr. Moore alleges interfered with his business relations between the 1996 incident involving the death of the child and the filing of the within action in 1999 occurred while Dr. Moore was either under peer review for specific instances of conduct or he was being "closely monitored" by Dr. Rubin as required by the numerous letters of reprimand stemming from this conduct. Thus, the defendants' actions were "taken or made in the conduct of professional review activity" and were "based on the competence or professional conduct of an individual physician." Section 11151(9), Title 42, U.S. Code. Thus, all of the defendants' actions during this period are considered professional review actions and, as such, are covered under the HCQIA. Id.; Section 11111(a)(1), Title 42, U.S. Code.
 {¶ 24} In order for the defendants' professional review actions to qualify for immunity, however, these actions must satisfy four requirements. The "professional review action must be taken — (1) in the reasonable belief that the action was in the furtherance of quality health care, (2) after a reasonable effort to obtain the facts of the matter, (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3)." Section 11112(a), Title 42, U.S. Code. As discussed above, the defendants' actions are presumed to meet the above standards unless rebutted by the plaintiff.
 {¶ 25} In determining whether the professional review actions were taken in the reasonable belief that the actions were in the furtherance of quality health care, we apply an objective test.Bryan, 33 F.3d at 1335 (citation omitted). Thus, any purported bad faith or malice on the part of the defendants is immaterial. Id.; Sugarbaker v. SSM Health Care (C.A.8, 1999), 190 F.3d 905,914 (citations omitted) ("the subjective bias or bad faith motives of the peer reviewers is irrelevant").
 {¶ 26} In this case, Dr. Moore has failed to establish that the defendants' actions were not taken in the reasonable belief that these actions were in the furtherance of quality health care. Although Dr. Moore alleged that the defendants' actions were done in bad faith, the defendants' motives, as discussed above, are irrelevant. Considering the high mortality rate experienced before the Magovern Group arrived, the death of the child caused by Dr. Moore's negligent treatment, and Dr. Moore's continued high mortality rate, it is clear that, under an objective test, the defendants' actions were taken in the reasonable belief that those actions were in the furtherance of quality health care.
 {¶ 27} "The relevant inquiry under [Section] 11112(a)(2)[, Title 42, U.S. Code] is whether the totality of the process leading up to the * * * `professional review action' * * * evidenced a reasonable effort to obtain the facts of the matter."Mathews v. Lancaster Gen. Hosp. (C.A.3. 1996), 87 F.3d 624,637. The first peer review process involving the death of the child encompassed numerous meetings and hearings over the course of a ten month period. The second review process regarding re-appointment of all staff again involved numerous meetings and hearings, which took place over a period of 14 months. Moreover, the record demonstrates that the focus of these processes was Dr. Moore's standard of care. Thus, it is evident that a reasonable effort was made to obtain the facts of the matter. See Pamintuanv. Nanticoke Mem. Hosp. (C.A.3, 1999), 192 F.3d 378, 389;Sugarbaker, 190 F.3d at 915; Mathews, 87 F.3d at 637;Bryan, 33 F.3d at 1335.
 {¶ 28} Dr. Moore was also provided with adequate notice and hearing procedures as required by Section 11112(a)(3), Title 42, U.S. Code. In both peer review processes, WRCS's bylaws regarding procedures and notice were followed. In fact, Dr. Moore availed himself of his right to appeal during the course of the first review. Moreover, Dr. Moore continually was kept abreast of the proceedings throughout both reviews. Thus, Dr. Moore was provided adequate notice and hearings that was fair under the circumstances. See Sugarbaker, 190 F.3d at 915-916; Bryan,33 F.3d at 1336.
 {¶ 29} Finally, the professional review action was taken in the reasonable belief that the action was warranted by the facts as known. The first review stemmed from Dr. Moore's negligent treatment of a child which resulted in death, while the second review stemmed from a regular bi-annual review of all
physicians for re-appointment. Considering the "broad discretion" hospitals maintain regarding staff privileges, Bryan,33 F.3d at 1337, and considering that the final result in both cases was a letter of reprimand, even though concerns were raised regarding Dr. Moore's standard of care and his high mortality rate, the defendants' actions certainly were reasonable. See id.;Mathews, 87 F.3d at 638.
 {¶ 30} For the foregoing reasons, we agree with the trial court that "[t]here is no fact presentation presented by [Moore in his response to the defendants' motion for summary judgment] to create an issue upon which reasonable minds may differ other than vague assertions." Thus, Moore has failed to establish sufficient facts to meet his burden of demonstrating that the peer review process was not reasonable and to rebut the presumption of immunity. Dr. Moore's first assignment of error is, therefore, without merit.
 {¶ 31} In his second assignment of error, Dr. Moore claims that WRCS's bylaws created a binding contract between WRCS and himself. Dr. Moore further claims that WRCS violated those bylaws.
 {¶ 32} "Staff bylaws can form a binding contract between a hospital and its medical staff only where there can be found inthe bylaws an intent by both parties to be bound." Munoz v.Flower Hosp. (1985), 30 Ohio App.3d 162, syllabus (emphasis added); see, also, Bouquett v. St. Elizabeth Corp. (1989),43 Ohio St.3d 50, 52, citing Munoz, 30 Ohio App.3d at 166.
 {¶ 33} In this case, the preamble to WRCS's bylaws states that "these Bylaws are a statement of self-governance of the Professional Staff of WRCS and are in no way intended to createany contractual relationship between the Professional Staff andthe Hospital." (Emphasis added.) This language clearly demonstrates that WRCS did not intend to be contractually bound by the bylaws. Thus, WRCS's bylaws did not create a binding contract between Dr. Moore and WRCS. Munoz, 30 Ohio App.3d 162, at the syllabus. Since there was no contractual relationship between WRCS and Dr. Moore, summary judgment in favor of WRCS on Dr. Moore's breach of contract claim was appropriate.
 {¶ 34} Dr. Moore's second assignment of error is without merit.
 {¶ 35} For the foregoing reasons, we hold that Dr. Moore's assignments of error are without merit. The decision of the Trumbull County Court of Common Pleas is affirmed.
Judith A. Christley, J., concurs, William M. O'Neill, J., dissents with a Dissenting Opinion.