OPINION
{¶ 1} This timely appeal comes for consideration upon the record in the trial court, the parties' briefs, and their oral arguments before this court. Plaintiff-Appellant, Dr. Richard Cowett, appeals the decision of the Mahoning County Court of Common Pleas that granted summary judgment to Defendants-Appellees, TCH Pediatrics, Inc., Forum Health, Western Reserve Care System, and Tod's Children's Hospital (collectively referred to herein as Forum). Dr. Cowett claims the trial court erred by not allowing discovery of a letter, by applying an incorrect standard when granting summary judgment, and by concluding that Forum is immune from suit. Dr. Cowett's arguments all stem from his belief that Forum will not be immune from suit if he can show that it acted in bad faith when terminating his staff privileges. However, both state and federal courts unanimously hold that we must look to the objective reasonableness of the hospital's actions, not whether those actions were taken in good faith. For these reasons, the trial court's decision is affirmed.
 Facts {¶ 2} Dr. Cowett is a pediatric neonatology specialist who was hired by Forum to be the Director of the Division of Neonatology at Tod's, which placed him in charge of Tod's Special Care Nursery (hereinafter SCN), a neonatal intensive care unit. Dr. Cowett began his duties with Forum on August 1, 2001. When he was hired, Tod's was affiliated with the Rainbow Babies and Children's Hospital in Cleveland, which is operated by the Cleveland-based University Hospitals Health Systems (hereinafter UH). Two of the neonatologists working at Tod's SCN, including Dr. Natalie Yeaney, worked with both UH and Forum. UH did not know of or approve Dr. Cowett's employment until after he was hired by Dr. Robert Felter, the Chairman of Pediatrics 
Adolescent Medicine for Western Reserve Care System and Tod's Medical Director and Administrator.
 {¶ 3} Dr. Cowett was not working at Forum long before staff members began complaining about his abilities. On September 21, 2001, Dr. Yeaney told Dr. Felter about concerns she had in regard to the care Dr. Cowett provided two infants, Baby F and Baby H. Dr. Felter had a staff board certified neonatologist who had not practiced in the area in a few years, Dr. Kurt Wegner, review the charts for these two patients. After a quick review, Dr. Wegner told Dr. Felter that there was cause to investigate Dr. Cowett further. Dr. Felter also spoke with the Chief Resident, Pediatric Residency Director, and SCN Nursing Manager, all of whom reported that the staff under their management had reported issues with Dr. Cowett's clinical skills.
 {¶ 4} On October 4, 2001, Dr. Felter was informed about further concerns that Dr. Yeaney and the SCN's nurse-practitioner, Beverly Mike-Nard, had regarding the care Dr. Cowett provided to Baby L. After speaking with Dr. Cowett, who denied that the care he provided was substandard, Dr. Felter placed him on administrative leave pending a formal review into the allegations against him.
 {¶ 5} Dr. Felter spoke with Dr. Wegner and Forum's Corporate Risk Manager, Michael Keating, who in turn spoke with a variety of people who had knowledge of the situation. However, neither Dr. Wenger nor Keating spoke with Dr. Cowett about the allegations However Howe. Dr. Wegner later gave Dr. Felter an Executive Summary which criticized the care Dr. Cowett had provided to Babies F, H, and L.
 {¶ 6} Dr. Felter and Dr. Wegner met with Dr. Cowett on October 15, 2001, to discuss the allegations. Dr. Cowett was given an opportunity to explain his side of the story. After this meeting, Dr. Wegner told Dr. Felter that the interview did not change the thoughts he expressed in his Executive Summary.
 {¶ 7} The information compiled by Dr. Wegner and Keating was later used as part of a Departmental Peer Review Report which was critical of Dr. Cowett's clinical abilities. Based on the information in this report, Dr. Felter requested that the Vice President of Medical Affairs initiate corrective action against Dr. Cowett. The Profession Executive Committee met on October 23, 2001, to discuss Dr. Felter's request and voted to recommend that Dr. Cowett's staff privileges be revoked. Dr. Cowett was provided notice of this recommendation on October 26, 2001.
 {¶ 8} Dr. Cowett requested a hearing, which occurred on March 6 and 13, 2002. The hearing was before a three physician panel and twelve witnesses testified. On March 20, 2002, the panel issued an opinion, which concluded that Dr. Cowett had failed to provide appropriate care and recommended that Dr. Cowett's privileges be revoked.
 {¶ 9} Dr. Cowett appealed this decision to Forum's board of directors, but on June 19, 2002, the Board voted to revoke his privileges. After Forum received a return receipt on the letter advising Dr. Cowett of the Board's decision, it reported the action to the National Practitioner Data Bank, a federal database which tracks hospital discipline of physicians.
 {¶ 10} On August 16, 2002, Dr. Cowett filed a complaint against Forum, asserting numerous claims resulting from these events. On February 26, 2004, Forum moved for summary judgment, claiming immunity pursuant to 42 U.S.C. 11111, et seq., commonly known as the Health Care Quality Improvement Act (hereinafter HCQIA). Dr. Cowett responded to the motion on January 31, 2005.
 {¶ 11} On February 3, 2005, Dr. Cowett moved to compel the production of a letter written immediately after his suspension from a physician at UH to Forum. The trial court ordered that the letter be produced in camera and, on April 4, 2005, denied Dr. Cowett's motion, concluding that the letter's contents were irrelevant and, therefore, not discoverable. The same day it denied Forum's motion for summary judgment and set the matter for trial.
 {¶ 12} On July 1, 2005, Forum asked the trial court to reconsider its prior order denying summary judgment and Dr. Cowett responded on July 8, 2005. On July 13, 2005, the trial court reconsidered its prior order and entered summary judgment to Forum, concluding that Forum was immune from suit pursuant to HCQIA.
 Summary Judgment {¶ 13} On appeal, Dr. Cowett argues three assignments of error, which all address the same issues of law and fact. They are:
 {¶ 14} "The trial court erred in granting summary judgment, by misconstruing Dr. Cowett's evidence as mere proof of `animosity,' rather than proof that movants did not satisfy the four requirements for immunity set forth in 42 U.S.C. 11112(a)."
 {¶ 15} "The trial court erred when it applied a summary judgment standard unsupported by HCQIA and Ohio law."
 {¶ 16} "The trial court erred in refusing to compel discovery of the UH letter."
 {¶ 17} Dr. Cowett argues that the trial court erred when granting summary judgment to Forum because the facts, when viewed in the light most favorable to him, show that they rebut the presumption of qualified immunity for Forum under HCQIA. In particular, he argues that Forum acted in bad faith when initiating and conducting the peer review process. He maintains that the trial court used the wrong standard when ruling on Forum's motion for summary judgment.
 {¶ 18} The standard a court uses when ruling on a motion for summary judgment on a claim of immunity under HCQIA is "somewhat unusual." Austin v. McNamara (C.A.9, 1992), 979 F.2d 728, 734;Moore v. Rubin, 11th Dist. No. 2001-T-0150, 2004-Ohio-5013, at ¶ 21; Menon v. Stouder Mem. Hosp. (Feb. 21, 1997), 2nd Dist. No. 96-CA2-7. Congress has concluded that there is a "need to improve the quality of medical care" and enacted HCQIA "to provide incentive and protection for physicians engaging in effective professional peer review." 42 U.S.C. 11101. In order to achieve this goal, HCQIA provides immunity from damages to the "professional review body, * * * any person acting as a member or staff to the body, * * * any person under a contract or other formal agreement with the body, and * * * any person who participates with or assists the body with respect to the action," as long as the professional review meets certain standards. 42 U.S.C. 11111(a)(1).
 {¶ 19} HCQIA creates a presumption in favor of immunity which may be rebutted by a preponderance of the evidence.42 U.S.C. 11112(a)(4). It is this rebuttable presumption in favor of immunity which creates the unusual standard courts must use when deciding motions for summary judgment involving HCQIA immunity.Austin at 734. In a sense, this means that the plaintiff bears the burden of proving that the peer review process was not reasonable. Bryan v. James (C.A.11, 1994), 33 F.3d 1318, 1333. Thus, courts must use the following standard for summary judgment when determining whether a professional review body is immune from suit under HCQIA: "Might a reasonable jury, viewing the facts in the light best for [the plaintiff], conclude that [the plaintiff] has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of 11112(a)?" Id.;Gureasko v. Bethesda Hosp. (1996), 116 Ohio App.3d 724, 731;Moore at ¶ 21. An appellate court uses this same standard on review and reviews the trial court's decision de novo. Catipayv. Humility of Mary Health Partners, 11th Dist. No. 2005-T0-030,2006-Ohio-1700.
 {¶ 20} Since we review the issues de novo, Dr. Cowett's second assignment of error is meritless. We will apply the proper standard when reviewing the trial court's decision, so it does not matter whether the trial court applied the proper standard. When a trial court states an erroneous basis for its judgment, we must still affirm that judgment if it is legally correct on other grounds, that is, if it achieves the right result for the wrong reason, because such an error was not prejudicial. AgriculturalIns. Co. v. Constantine (1944), 144 Ohio St. 275, 284.
 {¶ 21} In order to be eligible for immunity under the HCQIA, a professional review action must be taken "1) in the reasonable belief that the action was in the furtherance of quality health care, 2) after a reasonable effort to obtain the facts of the matter, 3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and 4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and [give adequate notice and hearing procedures]." 42 U.S.C. 11112(a).
 42 U.S.C. 11112(a)(1) {¶ 22} 42 U.S.C. 11112(a)(1) states that a professional review action must be taken "in the reasonable belief that the action was in the furtherance of quality health care." Dr. Cowett contends that any professional review action which is not instigated and carried out in a good faith belief that the action was in the furtherance of quality health care is not entitled to protection under the HCQIA. In support of this argument, he cites both the statutory language and Ahmed v. University HospitalsHealth Care System, Inc., 8th Dist. No. 79016, 2002-Ohio-1823. However, these sources do not unambiguously support Dr. Cowett's argument and courts have unanimously disagreed with his argument.
 {¶ 23} Dr. Cowett contends that evidence of animosity or hostility toward a health care professional is relevant under this statute because it shows that the action was not taken in the furtherance of quality health care. However, the language of the statute would only support Dr. Cowett's arguments if it allowed a defendant to commence a professional peer review action against someone only because it believes such action will further quality health care. This is not the language Congress used when it drafted the statute. Instead, HCQIA requires that the defendant must reasonably believe such action will further quality health care. HCQIA allows a hospital to have more than one reason to rid itself of a physician as long as "the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." Bryan at 1322. If a hospital rids itself of a doctor both because of health care concerns and because of financial/political concerns, HCQIA will give the hospital immunity from suit.
 {¶ 24} Because a hospital can be immune under HCQIA if it has a reasonable belief that a peer review action was taken in the furtherance of quality health care, even though it had ulterior motives for wanting to be rid of a particular physician, both state and federal courts nationwide have unanimously concluded that evidence of a hospital's bad faith is irrelevant and that courts should use an objective, rather than a subjective, test to determine whether a hospital's belief was reasonable. See Reyesv. Wilson Mem. Hosp. (S.D.Ohio, 1998), 102 F.Supp.2d 798, 812
("Within the universe of published decisions addressing this issue, the courts are unanimous in holding that evidence of `bad faith' does not suffice to overcome the presumption that a defendant acted `reasonably.'"). Ohio state courts have been part of the judicial unanimity on this issue. See Fox v. ParmaCommunity Gen Hosp., 160 Ohio App.3d 409, 2005-Ohio-1665, at ¶58; Moore v. Rubin, 11th Dist. No. 2001-T-0150, 2004-Ohio-5013, at ¶ 25; Menon at 2.
 {¶ 25} The sole case Dr. Cowett relies on, Ahmed, did not reach an opposite conclusion. Instead, it held that the evidence supported a jury's verdict that the defendants were not immune and noted, among other evidence, that the hospital had a financial motive for engaging in the peer review proceeding. But while the court's decision certainly indicates the possibility that it would approve using a subjective test, that defendant's motive was not the only evidence supporting the jury's conclusion. Furthermore, the same court later specifically held that a defendant's motive is irrelevant to these issues. SeeFox at ¶ 58.
 {¶ 26} At oral argument, Dr. Cowett stated that there is no way to challenge whether a hospital's belief that the action was taken in the furtherance of quality health care is reasonable if not by showing evidence of bad faith. This is simply not the case. For instance, a physician can challenge the facts forming the basis of a hospital's reasonable belief that the action was not taken in the furtherance of quality health care. In many cases this, of course, will be difficult. But Congress made challenges to HCQIA immunity a difficult prospect so physicians would have "incentive and protection for * * * engaging in effective professional peer review." 42 U.S.C. 11101.
 {¶ 27} Since any issue of bad faith is irrelevant, Dr. Cowett's arguments concerning the discoverability of a letter from UH to Forum is meritless. The sole reason Dr. Cowett wishes to discover that letter is to further his "bad faith" argument. The trial court did not abused its discretion when denying Dr. Cowett the ability to discover that letter.
 {¶ 28} When this law is applied to the facts of this case, we conclude the trial court properly granted summary judgment to Forum on the issue of whether the professional review action was taken in the reasonable belief that it was in furtherance of quality health care. The review of Dr. Cowett began after Dr. Yeaney voiced concerns about Dr. Cowett's professional competence to Dr. Felter on September 21, 2001, based on the cases of Baby F and Baby H. On October 4, 2001, Dr. Felter was also informed about concerns in the case of Baby L. These cases raised serious concerns regarding the care Dr. Cowett gave to three babies within the first two months of his employment.
 {¶ 29} The only evidence Dr. Cowett introduces to rebut the rebuttable presumption that Forum had a reasonable belief that the professional review action was in furtherance of quality health care is his evidence that Forum acted in bad faith. He did not provide any evidence showing that Forum concerns were unreasonable. Accordingly, the trial court did not err when it concluded that it should grant summary judgment to Forum on this issue. Dr. Cowett's arguments in this regard are meritless.
 42 U.S.C. 11112(a)(2) {¶ 30} Dr. Cowett next contends that Forum did not make a reasonable effort to obtain the facts before taking the professional review action. In particular, he criticized Forum's reliance on Dr. Wegner's opinion, since Dr. Wegner was not an actively practicing neonatologist and had not interviewed Dr. Cowett before preparing his executive summary; its reliance on a peer review report, which he claims contained serious flaws; Forum's failure to have a practicing, board certified neonatologist review the cases and testify at the hearing; and, Dr. Felter's failure to interview the surgeon before recommending the professional review action. Dr. Cowett's arguments in this regard are also meritless.
 {¶ 31} HCQIA requires that a defendant make a reasonable effort to obtain the facts of the matter before taking a professional peer review action in order to be immune under the statute. In order to determine whether a defendant made a reasonable effort to obtain the facts of the matter, a court must decide "whether the totality of the process" leading to the professional peer review action "evidenced a reasonable effort to obtain the facts of the matter." Mathews v. Lancaster Gen.Hosp. (C.A.3, 1996), 87 F.3d 624, 637. The question of whether a particular professional review action taken against a physician is reasonable is different than whether the action was taken after a reasonable effort to obtain the facts of the matter.Austin v. McNamara (9th Cir. 1992), 979 F.2d 728, 735.
 {¶ 32} When reviewing whether the effort to investigate was reasonable, courts have not stated that a reviewing body take any particular action. For instance, courts have refused to require "that only physicians in the same field as the physician under review are qualified to determine whether emergency action is necessary." Penninger v. Exempla, Inc. (C.Colo. 2000),116 F.Supp.2d 1184, 1202. Indeed, courts have held that those conducting the review do not even need to be physicians. Meyersv. Logan Mem. Hosp. (W.D.Kent. 2000), 82 F.Supp.2d 707, 713. Furthermore, the ultimate decisionmaker does not need to ensure that a matter is investigated independently, only that the investigation is reasonable. Gabaldoni v. Washington Co. Hosp.Assoc. (4th Cir. 2001), 250 F.3d 255, 261.
 {¶ 33} When reviewing whether an investigation was reasonable, courts do not require that such an investigation be accurate and thorough. Accordingly, courts have also overlooked factual errors in prepared reports that were used to reach a professional review action. See Brader v. Allegheny Gen. Hosp.
(3rd Cir. 1999), 167 F.3d 832, 841; Van v. Anderson (N.D.Tex. 2002), 199 F.Supp.2d 550, 572-573. Likewise, an investigation does not need to conclusively resolve why a particular incident which is the subject of the professional review occurred. Fox
at ¶ 59. Finally, the HCQIA does not require that a physician be notified of or participate in an investigation being conducted against him. Catipay v. Trumbull Mem. Hosp., 11th Dist. No. 2003-T-0136, 2004-Ohio-5108, at ¶ 44.
 {¶ 34} In this case, the incidents which formed the basis of the professional review action were reviewed by a board certified neonatologist who was last recertified in neonatology in 1996 and had last practiced in the field in 1997, four years before he was asked to review Cowett's actions. During the course of the investigation, Dr. Wegner, Dr. Felter, and Forum's corporate risk manager, Michael Keating, spoke to many hospital personnel about Dr. Cowett's practical skills. Finally, the issues were fully heard by a three member panel of the Professional Staff. Dr. Cowett's arguments do not rebut the presumption that this was a reasonable effort to obtain the facts. Instead, Dr. Cowett merely shows that the investigation was not as comprehensive and independent as he would have liked. The HCQIA does not require a comprehensive, independent investigation, only a reasonable effort to obtain the facts. Dr. Cowett's arguments in this regard are meritless.
 42 U.S.C. 11112(a)(3) {¶ 35} Dr. Cowett also argues that Forum did not provide him with adequate notice and hearing procedures. As an example, he cites the fact that the hearing panel issued its decision before the date by which he was told to submit a written statement. He also contends that he did not have notice of the true reasons behind the peer review action. Dr. Cowett's arguments in this regard are also meritless.
 {¶ 36} A professional review action is not immune under HCQIA unless it is taken "after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances."42 U.S.C. 11112(a)(3). 42 U.S.C. 11112(b) "enumerates the minimum, or `safe harbor' procedures that will, in every case, satisfy the adequate notice and hearing requirements" of42 U.S.C. 11112(a)(3). Bryan at 1323. However, the safe harbor provision also provides that `[a] professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3) of this section." 42 U.S.C. 11112(b). Furthermore, there is no requirement that "makes immunity depend on adherence to bylaws." Wieters v. Roper Hosp., Inc. (4th Cir. 2003), 58 Fed.Appx. 40, 46. "The ultimate inquiry is whether the notice and hearing procedures were adequate." Smith v. Ricks
(9th Cir. 1994), 31 F.3d 1478, 1486. The peer review proceedings need not resemble a regular trial to meet this requirement. Id. at 1487.
 {¶ 37} In this case, Dr. Cowett's only complaint about the notice given him is that it was not true notice of the reasons for the professional review action. However, he is merely re-raising the issue of whether Forum acted in bad faith when taking the professional review action. Since bad faith is not a proper issue to address when determining immunity under HCQIA, this is not a proper basis to challenge the notice given to him.
 {¶ 38} Dr. Cowett also complains that he was not provided adequate hearing procedures since he was not allowed to submit a written post-hearing statement to the hearing panel before it rendered its decision. He contends that 42 U.S.C. 11112(b) "statutorily entitled" him to submit such a statement.
 {¶ 39} Although 42 U.S.C. 11112(b)(3)(C)(v) does state that a physician must be given the right to "to submit a written statement at the close of the hearing" in order to meet the "safe harbor" standards set forth in 42 U.S.C. 11112(b),42 U.S.C. 11112(b) itself states that hearing procedures are not inadequate merely because they do not meet the conditions in that subsection. For example, 42 U.S.C. 11112(b)(1)(B)(ii) states that a physician should be afforded thirty days within which to request a hearing. However, a hospital can still provide adequate procedures if it only gives a physician fourteen days to request a hearing, depending on the facts of the case. See Egan v. AtholMem. Hosp. (D.Mass. 1997), 971 F.Supp. 37, 43-44.
 {¶ 40} In this case, Dr. Cowett's sole complaint is that he was not given the opportunity to provide the hearing panel with a written statement before it issued its recommendation. However, the hearing panel was not the ultimate decisionmaker in this case. After it made its recommendation, Dr. Cowett was given the opportunity to provide the Board with a written statement explaining the purported flaws in the hearing panel's opinion and Dr. Cowett submitted such a statement. Thus, Dr. Cowett was given an opportunity to place his arguments in the record before the Board made its decision, which is the purpose behind the requirement in 42 U.S.C. 11112(b)(3)(c)(v).
 {¶ 41} Based on these facts, the trial court did not err when it found that no reasonable fact-finder could conclude that the notice and hearing procedures provided to Dr. Cowett were inadequate. Dr. Cowett's arguments to the contrary are meritless.
 42 U.S.C. 11112(a)(4) {¶ 42} HCQIA's final requirement is that the professional review action be taken "in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3)."42 U.S.C. 11112(a)(4). When making this determination courts are "not to substitute our judgment for that of the hospital's governing board or to reweigh the evidence regarding the renewal or termination of medical staff privileges." Shahawy v.Harrison (11th Cir. 1989), 875 F.2d 1529, 1533. The relevant inquiry is whether the decision was reasonable in light of the facts known at the time the decision was made, not in light of facts later discovered. Egan at 44.
 {¶ 43} In this case, the record shows that Cowett failed to demonstrate that the Board's belief that the facts warranted the professional review action taken against Dr. Cowett was unreasonable. Fundamentally, the Board had two sets of facts before it. One set of facts contained the conclusions of two staff neonatologists, a nurse practitioner, experienced nurses, and hearsay evidence from residents who worked with Dr. Cowett, which all questioned Dr. Cowett's clinical abilities and the decisions he made in the cases in question. Another set of facts contained the testimony of Dr. Cowett, his expert witness, and other experienced nurses, which supported both Dr. Cowett's professional competence and the decisions he made in the cases in question. After reviewing these facts and the recommendations given to it, no reasonable factfinder could conclude that the Board's decision was unreasonable. Dr. Cowett's arguments to the contrary are meritless.
 Conclusion {¶ 44} Dr. Cowett believes Forum should not be immune from suit pursuant to HCQIA because it acted in bad faith when determining that his privileges should be revoked. However, the only relevant issues under HCQIA are with regard to the objective reasonableness of the hospital's actions, not whether those actions were taken in good faith. No reasonable fact-finder could conclude that Dr. Cowett could overcome the presumption that Forum's actions were reasonable. Accordingly, the judgment of the trial court is affirmed.
Donofrio, P.J., concurs.
Vukovich, J., concurs.