FOX, Appellant,

v.

PARMA COMMUNITY GENERAL HOSPITAL et al., Appellees.

[Cite as *Fox v. Parma Community Gen. Hosp.*, 160 Ohio App.3d 409, 2005-Ohio-1665.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 84428.

Decided April 7, 2005.

410

Levin & Associates Co., L.P.A., Joel Levin, and Erika D. Bailey; William K. Redmond Co., L.P.A., and William K. Redmond, for appellant.

Bricker & Eckler, Anne Marie Sferra, and Catherine M. Ballard; Cassidy & Reiman and Michael P. Cassidy, for appellees.

ANN DYKE, Presiding Judge.

{¶ 1} Plaintiff-appellant, Michael F. Fox, M.D., appeals from the order of the trial court that entered summary judgment in favor of defendants-appellees Parma Community General Hospital ("PCGH"), Edward Robertson, M.D., Patrick Renner, M.D., Spencer Anderson, M.D., Sherry Hillier, M.D., and Barbara Wojtala, in plaintiff's action for damages claimed in connection with peer-review proceedings. For the reasons set forth below, we affirm.

{¶ 2} Plaintiff is a medical doctor who is board certified as a specialist in colon and rectal surgery. In 1993, the board of trustees of the hospital extended "courtesy staff" privileges to plaintiff. The board continued to reappoint plaintiff for two-year periods and in 1999, gave him "active staff" privileges for general and colon and rectal surgery. Under the terms of the hospital's medical staff

bylaws, plaintiff was obligated to notify PCGH in the event that his privileges at any other health care facility were subject to corrective action.

{¶ 3} Plaintiff also had privileges at Southwest General Hospital ("Southwest") beginning in 1993. His privileges at Southwest were suspended in February 2000, however. It is undisputed that he did not notify PCGH of this suspension.

{¶ 4} In July 2000, plaintiff requested privileges to perform colostomies and polypectomies at PCGH. In ruling upon this request, the PCGH learned that plaintiff's privileges had been suspended at Southwest. The Surgical Services Quality Support Committee, a subcommittee of PCGH's Department of Surgery, subsequently reviewed all of plaintiff's cases from 1999 forward, or approximately 160 inpatient cases and approximately 310 outpatient cases.

{¶ 5} In December 2000, the hospital provided plaintiff with preliminary results of this review. PCGH did not identify quality-of-care issues, but did identify deficiencies of "medical record timeliness/documentation" pertaining to transcription and dictation of files and deficiencies of "utilization and length of stay" pertaining to patient admission and hospitalization.

{¶ 6} In January 2001, plaintiff was placed on precautionary suspension at St. John West Shore Hospital.

{¶ 7} In a report submitted to PCGH's Medical Staff Executive Committee on April 2, 2001, the Surgical Services Quality Support Committee indicated:

{¶ 8} "Individually, these cases may not have raised concerns. However, when these cases are reviewed and summarized there is a concern about the number of readmissions, and returns to surgery, as well as appropriateness of surgical procedures. The aggregate of these cases become problematic. As a result, the reviewers are recommending an outside review be done on [plaintiff's] cases.

{¶ 9} "Using various regulatory standards to evaluate plaintiff's cases during the relevant time period, PCGH compiled a list of nine cases for outside review. The Medical Staff Executive Committee selected Christopher R. Mantyh, M.D., an assistant professor of surgery at Duke University Medical Center, to conduct the review."

{¶ 10} Dr. Mantyh's results were presented to the Medical Staff Executive Committee on June 4, 2001. Dr. Mantyh concluded:

{¶ 11} "1. Many of the cases involve * * * patients with difficult medical and surgical problems [who would] benefit from having their surgical procedures performed at a tertiary medical care center [rather than PCGH].

{¶ 12} "2. Often a more complex surgery was performed than needed.

{¶ 13} "3. Surgical techniques that are either of historic interest or are very novel were employed for relatively straightforward problems.

{¶ 14} "4. Often the surgical plan was not completely thought out prior to the operation.

{¶ 15} "5. * * * Elderly, frail, and surgically unfit patients can be treated with various medical regimens * * *. The disastrous effects of operating on these tenuous patients are clearly documented in several of these reviews."

{¶ 16} PCGH suspended plaintiff following this meeting. The decision was affirmed upon reconsideration. On June 12, 2001, PCGH sent plaintiff a letter informing him of the suspension and advising him that he was entitled to a hearing. According to the hospital's bylaws, the "practitioner shall * * * have the burden of persuasion to prevail on his challenge to the adverse * * * action, by clear and convincing evidence that [the action is lacking] any factual basis or the conclusions drawn therefrom are either arbitrary, unreasonable, or capricious." Plaintiff requested a hearing and submitted a witness list to PCGH.

{¶ 17} The hearing was held on October 24, 2001. Plaintiff appeared with counsel. A court reporter was in attendance. For its case, PCGH presented the testimony of various doctors who had been involved in the initial review of plaintiff's cases and the Director of Quality and Continuum Services, who had submitted nine of plaintiff's cases to Dr. Mantyh for outside review. According to this witness, the charts chosen for outside review were selected based on various regulatory standards including the Performance Improvement Standards, Medical Staff Standards, and Center for Medicare and Medicaid Services Standards. Criteria considered in accordance with such standards included mortality, drug usage, blood usage, complications, and returns to surgery.

{¶ 18} The reviewer, Dr. Mantyh, did not testify, but his report was submitted into evidence. Dr. Mantyh was critical of plaintiff's treatment of the nine patients at issue, including his surgical techniques and presurgical preparation. According to Dr. Mantyh, complex surgery had been performed on some patients who had other medical problems and were not good candidates for such procedures. In other instances, according to Dr. Mantyh, an unusual or inappropriate surgical technique was employed. In another instance, a complex procedure was employed in a relatively straightforward case. However, one patient suffered complications from a diagnostic test, which was apparently the result of a radiologist's error. None of the patients died.

{¶ 19} Plaintiff cross-examined the witnesses and also testified. He defended his care of each of the nine patients at issue. He disagreed with some of the diagnoses that Dr. Mantyh had made following his review of the records, disputed Dr. Mantyh's assessment of the correct technique for treating the patient, and noted that Dr. Mantyh had completed his training only two years prior to the hearing. Plaintiff admitted that he had failed to notify PCGH of the suspension at Southwest but he stated that he did not know that he was required to do so.

Finally, plaintiff submitted a letter from his expert, Dr. Marvin Gorman, in which Gorman indicated that he had reviewed the medical records at issue and that the suspension of hospital privileges was unjustified.

{¶ 20} The hearing officer upheld the suspension and determined that it was supported by a factual basis and was not shown to be arbitrary, unreasonable, or capricious. Plaintiff appealed the decision to the review committee but the suspension was upheld.

{¶ 21} Plaintiff filed suit against PCGH, Dr. Robertson, Dr. Renner, Dr. Anderson, Dr. Hillier, and Ms. Wojtala on October 17, 2002. In his second amended complaint for relief, plaintiff asserted claims for breach of express contract, breach of implied contract, tortious interference with business relationships, unfair competition, fraud, defamation, abuse of process, and engaging in a pattern of corrupt activity.

{¶ 22} Defendants denied liability and moved for summary judgment based on the immunity provisions set forth in the Health Care Quality Improvement Act ("HCQIA"), Section 11101 et seq., Title 42, U.S.Code. In opposition, plaintiff presented the affidavit of Timothy J. Pritchard, M.D., in which he opined to a reasonable degree of medical certainty that the peer review contained false, fraudulent, deceptive, and misleading statements impugning the quality of care rendered by plaintiff. The trial court subsequently concluded that the four factors set forth in the HCQIA for determining whether the participants in a professional-review action were entitled to immunity had been met and granted summary judgment for defendants. This ruling rendered moot defendants' motion for a protective order, and plaintiff's motion to compel discovery. Plaintiff now appeals and assigns two errors for our review.

{¶ 23} Plaintiff's first assignment of error states:

{¶ 24} "The lower court erred to the prejudice of Appellant by deciding that there was no genuine issue as to any material fact and that Appellees were entitled to judgment as a matter of law on the issue of immunity from damages pursuant to the HCQIA."

A. Scope and Purpose of the HCQIA

{¶ 25} Congress adopted the HCQIA in 1986, in response to the "increasing occurrence of medical malpractice and the need to improve the quality of medical care" in the United States. Section 11101(1), Title 42, U.S.Code. The purpose of the statute is to provide for effective peer review and monitoring of physicians. Id.; see, also, *Meyers v. Columbia/HCA Healthcare Corp.* (C.A.6, 2003), 341 F.3d 461, 467; *Austin v. McNamara* (C.A.9, 1992), 979 F.2d 728, 733; *Bryan v. James E. Holmes Reg. Med. Ctr.* (C.A.11, 1994), 33 F.3d 1318, 1322.

## B. Immunity Under HCQIA

{¶ 26} In furtherance of this goal, the HCQIA grants immunity from actions for damages to participants in medical-peer-review activities.[1] See Section 11111, Title 42, U.S.Code; *Meyers v. Columbia/HCA Healthcare Corp.*, supra; *Brown v. Presbyterian Healthcare Servs.* (C.A.10, 1996), 101 F.3d 1324, 1333; *Pfenninger v. Exempla, Inc.* (D.Colo.2000), 116 F.Supp.2d 1184, 1198.

{¶ 27} That is, the HCQIA provides that a "professional review body"[2] taking a "professional review action"[3] "shall not be liable in damages under any law of the United States or of any State * * * with respect to the action." Section 11112(a), Title 42, U.S.Code. Immunity is also granted to those individuals "providing information to a professional review body regarding the competence or professional conduct of a physician * * * unless such information is false and the person providing it knew that such information was false." Section 11111(a)(2), Title 42, U.S.Code.

{¶ 28} Qualifying "professional review actions" are those taken:

{¶ 29} "(1) in the reasonable belief that the action was in the furtherance of quality health care,

{¶ 30} "(2) after a reasonable effort to obtain the facts of the matter,

{¶ 31} "(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

{¶ 32} "(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3)." Section 11112(a), Title 42, U.S.Code.

{¶ 33} Considering each of these four factors in turn, we note, with regard to the first factor, that in determining whether the professional-review actions were taken in the reasonable belief that the actions were in the furtherance of quality health care, we apply an objective test. *Moore v. Rubin*, Trumbull App. No. 2001–T–0150, 2004-Ohio-5013, 2004 WL 2803237; *Bryan v. James E. Holmes Reg. Med. Ctr.*, supra. Thus, any purported bad faith or

---

1. R.C. 2305.251 likewise provides immunity to members of professional review committees. See *Gureasko v. Bethesda Hosp.* (1996), 116 Ohio App.3d 724, 689 N.E.2d 76.

2. The term "professional review body" means a health care entity and the governing body or any committee of a health care entity which conducts professional review activity and any person who participates with or assists in the peer review. See Section 11151(11), Title 42, U.S.Code.

3. This term includes professional-review activities relating to a professional-review action. Section 11151(9), Title 42, U.S.Code.

malice on the part of the defendants is immaterial. Id.; *Moore v. Rubin,* supra; *Sugarbaker v. SSM Health Care* (C.A.8, 1999), 190 F.3d 905, 914 ("the subjective bias or bad faith motives of the peer reviewers is irrelevant"). Moreover, the act does not require that the professional review result in actual improvement in the quality of health care, only that it was undertaken in the reasonable belief that quality health care was being furthered. *Moore v. Rubin,* supra.

{¶ 34} Second, with regard to whether the board's action was taken after a reasonable effort to obtain the facts of the matter under Section 11112(a)(2), Title 42, U.S.Code, "[t]he relevant inquiry is 'whether the totality of the process leading to the [review action] evinces a reasonable effort'" to obtain the facts. *Pfenninger v. Exempla, Inc.,* 116 F.Supp.2d at 1202, quoting *Mathews v. Lancaster Gen. Hosp.* (C.A.3, 1996), 87 F.3d 624, 637.

{¶ 35} Third, we must consider whether there were "adequate notice and hearing procedures" afforded to the physician who is the subject of the action under Section 11112(a)(3), Title 42, U.S.Code.

{¶ 36} The HCQIA sets forth detailed conditions for adequate notice and hearing in Section 11112(b).

{¶ 37} This section provides:

{¶ 38} "(b) Adequate notice and hearing. A health care entity is deemed to have met the adequate notice and hearing requirement of subsection (a)(3) with respect to a physician if the following conditions are met (or are waived voluntarily by the physician):

{¶ 39} "(1) Notice of proposed action. The physician has been given notice * * *

{¶ 40} "(2) Notice of hearing. * * *

{¶ 41} "(3) Conduct of hearing and notice. If a hearing is requested on a timely basis under paragraph (1)(b)—

{¶ 42} "(A) subject to subparagraph (B), the hearing shall be held (as determined by the health care entity)—

{¶ 43} "(i) before an arbitrator mutually acceptable to the physician and the health care entity,

{¶ 44} "(ii) before a hearing officer who is appointed by the entity and who is not in direct economic competition with the physician involved, or

{¶ 45} "(iii) before a panel of individuals who are appointed by the entity and are not in direct economic competition with the physician involved;

{¶ 46} "(B) the right to the hearing may be forfeited if the physician fails, without good cause, to appear;

{¶ 47} "(C) in the hearing the physician involved has the right—

{¶ 48} "(i) to representation by an attorney or other person of the physician's choice,

{¶ 49} "(ii) to have a record made of the proceedings, copies of which may be obtained by the physician upon payment of any reasonable charges associated with the preparation thereof,

{¶ 50} "(iii) to call, examine, and cross-examine witnesses,

{¶ 51} "(iv) to present evidence determined to be relevant by the hearing officer, regardless of its admissibility in a court of law, and

{¶ 52} "(v) to submit a written statement at the close of the hearing;  and

{¶ 53} "(D) upon completion of the hearing, the physician involved has the right—

{¶ 54} "(i) to receive the written recommendation of the arbitrator, officer, or panel, including a statement of the basis for the recommendations * * *."

{¶ 55} With regard to the fourth factor, the board's action was taken in the reasonable belief that the action was warranted by the facts, under Section 11112(a)(4).  Courts consider whether the information relied upon by the board was so obviously mistaken or inadequate such as to make reliance on it unreasonable.  See *Brader v. Allegheny Gen. Hosp.* (C.A.3, 1999), 167 F.3d 832, 843; *Mathews v. Lancaster Gen. Hosp.,* 87 F.3d at 632.

{¶ 56} Finally, the HCQIA contains the following rebuttable presumption of immunity: "A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence." Section 11112(a), Title 42, U.S.Code. That is, the plaintiff must demonstrate that one of the requirements for immunity was not met.  *Mathews v. Lancaster Gen. Hosp.,* supra.  Thus, a somewhat unconventional standard is applied in ruling upon a motion for summary judgment—whether a reasonable jury, viewing all facts in a light most favorable to the plaintiff, could conclude that he demonstrated by a preponderance of the evidence that the defendants' actions fell outside the scope of section 11112(a).  Section 11112(a), Title 42, U.S.Code; *Moore v. Rubin,* 2004-Ohio-5013; *Sugarbaker v. SSM Health Care* (C.A.8, 1999), 190 F.3d 905, 912;  *Brader v. Allegheny Gen. Hosp.* (C.A.3, 1999), 167 F.3d 832, 839; *Austin v. McNamara* (C.A.9, 1992), 979 F.2d 728, 733.

C.   Application of HCQIA Requirements to This Matter

{¶ 57} In this matter, plaintiff insists that the presumption of immunity was defeated because critical material facts were falsified in each of the nine cases

that were the focus of the peer review. While he does not know whether PCGH supplied Dr. Mantyh with false information or whether Dr. Mantyh unilaterally invented and falsified information for his report, he insists that such falsification occurred and that this defeats immunity in this matter. He also ascribes sinister motives to hospital personnel and complains that the review was continued despite a preliminary determination that no quality-of-care issues were identified in a preliminary report.

{¶ 58} As an initial matter, we note that any purported bad faith or malice on the part of the defendants is immaterial. *Moore v. Rubin,* supra; *Bryan v. James E. Holmes Reg. Med. Ctr.,* supra. It is undisputed that plaintiff's status at the hospital was evaluated only after PCGH learned of the suspension at Southwest. Further, the preliminary report clearly expressed concern about the number of readmissions and returns to surgery, as well as the appropriateness of surgical procedures. Moreover, the record irrefutably establishes that an outside reviewer was selected to avoid the appearance of impropriety, and cases were chosen for outside review based upon clearly defined criteria, including postsurgical complications. Absolutely no evidence of any fraud or falsification was presented. Rather, the record clearly portrays what is most fairly described as genuine differences in opinion regarding the preoperative status of some of the patients, their surgical or medical problems, the best techniques for dealing with such problems, and their conditions following surgery. Indeed, the essence of the record is best described in Dr. Pritchard's averment, "What surgery was required is a judgment call on the part of the surgeon." Looking to the totality of the circumstances, the professional-review action was "undertaken in the reasonable belief that quality health care was being furthered." Accordingly, the first requirement was clearly met.

{¶ 59} With regard to the second requirement, whether the totality of the process leading to the review action evinces a reasonable effort to obtain the facts, plaintiff complains that the hospital did not fairly ascertain why the radiological incident occurred. While this incident was not conclusively resolved, neither it nor the hospital's overall effort demonstrates an unreasonable effort to obtain the facts. The probe targeted cases fitting defined criteria, and these cases were analyzed as to possible diagnoses, appropriate procedures in light of the patient's overall condition, and any resulting complications. The second requirement was met. With regard to whether the notice and hearing procedures were adequate, it must be noted that Dr. Mantyh did not testify and that his report was admitted into evidence. However, a "professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3)." Thus, "if other procedures are followed, but are not precisely of the character spelled out in

section 11112(b), the test of 'adequacy' may still be met under other prevailing law." *Monroe v. AMI Hospitals of Texas, Inc.* (S.D.Texas 1994), 877 F.Supp. 1022, 1030. Ultimately, the inquiry is whether the notice and hearing procedures were adequate or fair to the physician under the circumstances. See Section 11112(a)(4), Title 42, U.S.Code; *Smith v. Ricks* (C.A.9, 1994), 31 F.3d 1478, 1486; *Fobbs v. Holy Cross Health Sys. Corp.* (C.A.9, 1994), 29 F.3d 1439, 1445. Moreover, as noted in *Menon v. Stouder Mem. Hosp.* (Feb. 21, 1997), Miami App. No. 96–CA–27, 1997 WL 71778, the use of hearsay is permitted in administrative-type hearings, but the "discretion to consider hearsay evidence cannot be exercised in an arbitrary manner."

{¶ 60} In this matter, plaintiff criticized Dr. Mantyh's assumptions and conclusions regarding each of the nine patients and offered thorough explanations of their conditions and his choices in treating them. In accordance with all of the foregoing, we cannot conclude that the hearing procedures were inadequate or unfair under the circumstances.

{¶ 61} Finally, with regard to whether the board's action was taken in the reasonable belief that the action was warranted by the facts, we note that competent, credible evidence supported the suspension. Evidence presented by PCGH suggested that some of the surgical techniques employed were not well suited for that particular patient in that facility or that complications resulted. The fourth requirement was met.

{¶ 62} In accordance with all of the foregoing, the trial court correctly entered summary judgment for defendants. The first assignment of error is overruled.

{¶ 63} Plaintiff's second assignment of error states:

{¶ 64} "The lower court erred to the prejudice of Appellant and abused its discretion by failing to rule on Appellee's Motion for a Protective Order to Stay Discovery (R. 26) for over a year or to rule on Appellant's Motion to Compel Discovery (R. 33). This denied Appellant any discovery, when it was made clear to the Court that the immunity determination rested on disputed factual issues and where the requested discovery bore directly on material factual issues in dispute."

{¶ 65} Civ.R. 26(B)(1) provides that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending litigation." Under R.C. 2305.252, the proceedings and records of review committees are confidential and not subject to discovery in a civil action against a hospital unless they are otherwise available from other sources.

{¶ 66} In this matter, plaintiff maintained that his records of treatment fully supported his actions. He further alleged that the medical records of the nine patients were falsified during the course of the peer review. The essence of his

case in the hearing demonstrated, however, that he and Dr. Mantyh were in disagreement over the diagnosis, treatment, and postsurgical course of some of the patients. Accordingly, plaintiff did not seek records otherwise available from other sources but rather sought the proceedings and records of the peer-review committee. Thus, plaintiff sought privileged information. Moreover, because the trial court correctly determined that the peer review satisfied the requirements for immunity under the HCQIA, this claim has been rendered moot.

{¶ 67} The second assignment of error is without merit.

Judgment affirmed.

FRANK D. CELEBREZZE JR. and DIANE KARPINSKI, JJ., concur.