GEORGOPOULOS, Appellant,

v.

HUMILITY OF MARY HEALTH PARTNERS, INC., d.b.a.
St. Elizabeth Health Center, et al., Appellees.

[Cite as *Georgopoulos v. Humility of Mary Health Partners,
Inc.*, 195 Ohio App.3d 133, 2011-Ohio-3123.]

Court of Appeals of Ohio,
Eleventh District, Trumbull County.

No. 2010–T–0071.

Decided June 24, 2011.

George Georgopoulos, pro se.

Buckingham, Doolittle & Burroughs, L.L.P., Joseph J. Feltes, and Justin S. Greenfelder, for appellees.

DIANE V. GRENDELL, Judge.

{¶ 1} Plaintiff-appellant, George Georgopoulos, M.D., appeals the judgment of the Trumbull County Court of Common Pleas, granting summary judgment in favor of defendants-appellees, Humility of Mary Health Partners, Inc., d.b.a. St. Elizabeth Health Center, Clifford Waldman, M.D., and Nicholas C. Cavarocchi, M.D., on the grounds that the defendants were entitled to immunity under the federal Health Care Quality Improvement Act, Section 11101 et seq., Title 42, U.S.Code. For the following reasons, we affirm the decision of the court below.

{¶ 2} On October 30, 2008, Dr. Georgopoulos filed a complaint for compensatory and punitive damages, declaratory judgment, and other relief against Humility of Mary Health Partners, Dr. Waldman, and Dr. Cavarocchi. Georgopoulos alleged causes of action for breach of contract, unfair competition in violation of R.C. 4165.02, tortious interference with business relations, negligent infliction of emotional distress, and defamation, and sought declarations that Humility of Mary Health Partners violated his due-process rights and that none of the defendants are entitled to immunity under the Health Care Quality Improvement Act.

{¶ 3} On March 18, 2010, the defendants filed their motion for summary judgment. Dr. Georgopoulos filed his brief in opposition on April 19, 2010.

{¶ 4} The following facts were stipulated to by the parties in prior federal litigation addressing the same claims as raised herein.[1]

8. Dr. Georgopoulos is licensed to practice medicine by the State of Ohio. He is also "board-certified" in cardiothoracic surgery by the American Board of Thoracic Surgery. He was first board-certified in 1986, and re-certified on December 29, 2004.

\* \* \*

13. Dr. Georgopoulos was an active member of the Medical Staff of St. Elizabeth Health Center in Youngstown, Ohio, from April 1985 until May 2005. Dr. Georgopoulos also had Medical Staff membership and privileges at Northside Hospital, but did not operate there.

14. Dr. Cavarocchi was the first heart surgeon to become an employee of St. Elizabeth, when he was hired on April 7, 2003, to be the Hospital's Director of the Cardiac Surgery Program.

\* \* \*

---

1. According to the defendants, Dr. Georgopoulos's claim for defamation was not previously raised in the federal complaint.

19. Dr. Georgopoulos is not an employee of St. Elizabeth Health Center and never has been.

\* \* \*

21. As a member of the Medical Staff, Dr. Georgopoulos held privileges in cardiothoracic surgery. The Medical Staff is organized into Departments, and within Departments there are Sections. The Cardiothoracic Surgery Section is part of the Department of Surgery.

22. Dr. Georgopoulos' privileges permitted him to use St. Elizabeth's operating room and other surgical resources to perform open heart operations, including "coronary artery bypass" or "CABG" operations, without any assistance from another surgeon.

\* \* \*

25. In the late 1990's, Dr. Georgopoulos began to learn a technique for performing CABG procedures without using a heart-lung bypass machine. This is known as "off-pump" surgery. ·

\* \* \*

30. Dr. Georgopoulos's status as a member of the St. Elizabeth Medical Staff was governed by the St. Elizabeth Health Center Bylaws and Manual which were adopted December 8, 1998, and revised October 7, 2003.

\* \* \*

38. Dr. Waldman was the Chief Medical Officer at St. Elizabeth Health Center. He had oversight responsibility for clinical performance and improvement in all departments and sections.

39. St. Elizabeth collects data on heart surgeries performed at the Hospital and reports those data to the Society of Thoracic Surgeons ("STS"), for inclusion in the STS adult cardiac surgery database. STS instructs the Hospital what data to collect.

40. The purpose of the STS adult cardiac surgery database is to improve quality of cardiothoracic surgical care at the local and national level.

\* \* \*

41. STS analyzes the data collected by St. Elizabeth and other hospitals and periodically issues a report to St. Elizabeth in which some of the data are "risk-adjusted" so that meaningful comparisons can be made between St. Elizabeth and other groups of hospitals.

\* \* \*

46. A primary measure of quality of care in heart surgery is outcomes, that is, whether the patient survived the operation free of major complications, such as stroke or brain damage. A death after cardiac surgery is tracked under

statistics concerning "mortality." Illness or other complications after cardiac surgery are tracked under statistics concerning "morbidity."

47. The morbidity and mortality statistics of Dr. Georgopoulos and the other cardiac surgeons at St. Elizabeth were always within the acceptable range.

\* \* \*

50. The STS Report provided to St. Elizabeth Health Center in December 2003 showed, among other things, the following:

i. the average time a CABG took at St. Elizabeth was longer than the average at other hospitals in the "Region" in which STS placed St. Elizabeth, and longer than the average at all hospitals that report to the STS database.

ii. the average time a CABG procedure took at St. Elizabeth from 2000–2003 became longer during those years, while in the Region, and STS overall, the average length of time for a CABG operation increased less, or decreased.

iii. the percentage of CABG patients at St. Elizabeth who took anti-clotting or other medications that could cause or contribute to excessive bleeding during an operation was higher than the Region, and STS overall, and was increasing from 2000–2003, while the percentage of CABG patients at other hospitals taking such medications during that time was decreasing.

iv. the percentage of times that blood products are introduced to a patient after CABG surgery at St. Elizabeth was greater than the same statistic for the Region and STS overall.

v. the percentage of times that an "intra-aortic balloon pump" or IABP is present in a patient undergoing heart surgery at St. Elizabeth is greater than the same statistic for the Region and STS overall.

51. "Cell-saver" blood is blood that is salvaged from a patient during an operation, washed and filtered in a "cell-saver" machine, and then returned to a patient during the operation.

52. STS does not collect data on "cell-saver" blood for its database.

53. On May 7, 2004, Dr. Georgopoulos operated on Patient A. During the operation, Patient A developed bleeding complications. Dr. Georgopoulos started the operation "off-pump." He later converted it to "on-pump." Patient A remained in the operating room for 22 hours and 45 minutes.

54. Pat Steadman, the Hospital's Director of Surgical Services, reported this case to Lisa Parish, the Hospital's Vice President of Heart and Vascular Services, on or about May 11, 2004. Mrs. Parish reported the case to Dr. Awad, Chairman of the Department of Surgery, who stated he would look into it.

55. Mrs. Parish also reported the case of Patient A to Dr. Waldman and to Dr. Cavarocchi * * *.

56. At or around the time that Mrs. Parish told Dr. Waldman and Dr. Cavarocchi about the case of Patient A, she also told them of Patient B, a man on whom Dr. Georgopoulos had operated on March 7, 2004. A perfusionist and anesthesiologist had complained that the operation on Patient B involved an unusually large amount of blood products, including cell-saver blood.

57. On May 20, 2004, Dr. Georgopoulos was called to a meeting with Dr. Awad, * * * Dr. Cavarocchi and Dr. Waldman. At that meeting, Dr. Georgopoulos was asked to describe the cases. At that time, Dr. Georgopoulos was asked to voluntarily refrain from operating until an investigation by the Department of Surgery could be conducted into the cases of Patients A and B. Dr. Awad and Dr. Waldman decided to have the cases reviewed by an independent heart surgeon who had no contact with St. Elizabeth.

58. On June 2, 2004, Dr. Waldman provided certain information on Patient A and Patient B to Dr. Benjamin Sun, a heart surgeon at The Ohio State University Hospital, who had been hired by the Hospital to review Dr. Georgopoulos' performance. Dr. Waldman explained to Dr. Sun that the concern over Patient A included prolonged time in the operating room and use of unusually large volumes of blood and blood products, and the concern over Patient B included the use of an [un]usually large volume of blood products.

59. Neither Dr. Waldman nor anyone else from St. Elizabeth told Dr. Sun of the STS data showing that the average CABG procedure at St. Elizabeth took longer than compared to other hospitals in the Region and to STS overall and used more blood products post-operatively.

* * *

61. Dr. Sun provided a written review of the Patient A and Patient B cases on June 8, 2004. Dr. Georgopoulos was provided a copy of Dr. Sun's written review of the Patient A and Patient B cases.

62. On June 9, 2004, based on Dr. Sun's written review, Dr. Waldman, Dr. Awad and Dr. Potesta, the President of the St. Elizabeth Medical Staff, requested that Dr. Sun peer review 8 additional cases of Dr. Georgopoulos' "with attention to the time required for bypass and the amount of blood reinfused or transfused."

* * *

67. On June 29, 2004, Dr. Sun sent Dr. Waldman a written review of the 8 additional cases of Dr. Georgopoulos that had been requested. A copy of that report was provided to Dr. Georgopoulos.

68. On the basis of that report, Dr. Potesta, Dr. Awad and Dr. Waldman concluded that Dr. Georgopoulos should continue to refrain from performing cardiac bypass surgery.

69. On July 1, 2004, Dr. Awad and Dr. Waldman met with Dr. Georgopoulos to discuss Dr. Sun's second report. Dr. Awad and Dr. Waldman presented various options to Dr. Georgopoulos. Dr. Georgopoulos rejected these options.

70. Dr. Georgopoulos asked Dr. Awad and Dr. Waldman if he could obtain his own independent reviewer to look at the same cases Dr. Sun had been sent. The Hospital agreed to let Dr. Georgopoulos find his own reviewer. Dr. Georgopoulos arranged for Dr. A. Mac Gillinov, a heart surgeon at The Cleveland Clinic, to review the cases.

\* \* \*

73. On July 29, 2004, Dr. Gillinov provided to Dr. Georgopoulos a written review of the same 10 cases Dr. Sun had reviewed.

74. Based on Dr. Gillinov's report, Dr. Georgopoulos informed the Hospital that he would no longer voluntarily refrain from performing cardiac surgery. As a result, the matter was referred to the Medical Executive Committee [which oversees credentialing and performance improvement and conducts the daily business of the Medical Staff].

75. The Medical Executive Committee consists of the President, the President Elect and the Secretary–Treasurer elected by the Medical Staff. It also consists of the Past President of the Medical Staff, 12 Department Chairpersons, and 11 at-large members elected by the Medical Staff. \* \* \*

76. On August 10, 2004, the Medical Executive Committee ("MEC") met. Dr. Awad, as chairperson of the Department of Surgery, was unable to attend the meeting. Dr. Cavarocchi and Dr. Waldman addressed the MEC concerning Dr. Georgopoulos. Dr. Cavarocchi presented certain data to the MEC, but neither he nor Dr. Waldman referred to any STS data. The MEC voted to conduct a formal investigation into Dr. Georgopoulos' clinical competence in cardiac surgery. The MEC also voted to impose on Dr. Georgopoulos a requirement of "concurrent monitoring" by a hospital-credentialed cardiac surgeon, including for emergency cases, until the matter was resolved.

77. Also on August 10, 2004, Dr. Potesta, the President of the Medical Staff, appointed an Investigating Committee of three medical staff members to conduct the investigation into Dr. Georgopoulos' clinical competence in cardiac surgery, as authorized by the Medical Staff Bylaws and Manual.

78. According to Dr. Potesta, the purpose of the Investigating Committee's formal investigation was to determine whether there is sufficient evidence to warrant a formal hearing.

\* \* \*

80. The Investigating Committee consisted of Dr. John Jakubek, Dr. Rashid Abdu and Dr. Benjamin Hayek.

81. On September 23, 2004, the Investigating Committee presented its report and recommendation to the MEC at a meeting of the MEC. The Investigating Committee recommended, among other things, that "a mutually agreed upon observer, a board-certified actively practicing cardiothoracic surgeon be retained for the purposes of observing Dr. [Georgopoulos'] techniques for a minimum of the next six (6) coronary bypass procedures * * *"

82. The MEC voted to adopt a modified version of the Investigating Committee's recommendation that a board-certified heart surgeon actively practicing cardiothoracic surgery observe Dr. Georgopoulos's next six bypass cases. The MEC did not adopt any of the other recommendations of the Investigating Committee.

83. On September 28, 2004, Dr. Georgopoulos was informed of the MEC's decision. He was also informed that the Hospital was willing to pay a "reasonable cost" for the observing physician. Dr. Georgopoulos was also informed that he had a right to appeal the MEC's decision by requesting a hearing before a Hearing Panel of Medical Staff members.

* * *

85. On October 19, 2004, Dr. Georgopoulos notified the Hospital that he was requesting a hearing to appeal the MEC's September 23, 2004 decision.

86. Dr. Potesta appointed a Hearing Panel consisting of Dr. David Hoffman, Dr. Chander Kohli and Dr. Steven Kalarsky.

87. At the Hearing, both Dr. Georgopoulos and the Hospital each were represented by legal counsel.

* * *

89. One of Dr. Georgopoulos's attorneys, Mr. Kleinman, had made numerous requests to [the] Hospital's attorneys for the Hospital's STS data before and after the Hearing began. Counsel for the Hospital did not provide the STS report to Dr. Georgopoulos and his counsel until the beginning of the hearing session that was held on January 25, 2005. Counsel for Dr. Georgopoulos objected because he had not received the STS data earlier.

90. Hearings were held on December 1, 2004, January 20, 2005, January 25, 2005, February 9, 2005 and February 10, 2005.

91. On July 25, 2005, the Hearing Panel issued its decision.

92. The Hearing Panel's written opinion concluded by stating: "After due consideration of all the evidence and statements and arguments of counsel for both sides, it is the opinion of this Hearing Panel that the MEC did act in good faith and made appropriate recommendations based on the information that we

understand to have been presented to the MEC. However, we were presented with additional testimony and documentation that we feel necessitates our conclusion that the recommendation of the MEC, as set forth in the minutes of the September 23, 2004 meeting, may not have been warranted based on the additional evidence that was presented to us throughout this hearing."

93. On August 4, 2005, Dr. Potesta, as President of the Medical Staff, distributed the Hearing Panel's opinion to the members of the MEC along with a summary of the testimony and exhibits that were presented to the Hearing Panel. Dr. Potesta also invited the members of the MEC to review the transcripts of the hearing and the exhibits, which were made available for 30 days in the Medical Staff office.

94. On September 7, 2005, the MEC met to consider the Hearing Panel's Opinion.

95. At the meeting, the MEC voted unanimously to uphold its own prior recommendation of September 23, 2004, that Dr. Georgopoulos be observed by a board-certified heart surgeon actively practicing cardiothoracic surgery for six cases. Dr. Georgopoulos continued to object to being monitored.

96. On September 22, 2005, Dr. Georgopoulos submitted to the Hospital his request for an appeal of the MEC's adverse recommendation. The appeal would be presented to the Appellate [R]eview Committee, a committee of the Hospital's Board of Directors, which would review the record and make a recommendation to the Board of Directors for final action. The letter requesting the appeal was the only submission Dr. Georgopoulos was permitted to make in connection with the appeal. He had no right under the Bylaws and Manual to meet with the Appellate Review Committee, and was not invited to do so.

97. The Appellate Review Committee consisted of three non-physician members of the Hospital's Board of Directors: Suzanne Fleming, Sister Jean Orsuto and Leonard D. Schiavone.

98. The Appellate Review Committee met on October 20, 2005 to discuss Dr. Georgopoulos' appeal. On October 20, 2005, the Committee issued a Memorandum stating: "While the Appellate Review Committee feels that MEC followed the process as outlined in the Medical Staff Bylaws, and we commend them for their effort in investigating this quality issue, there did not appear to be justification for the recommended action based on the lack of evidence of whether requiring concurrent monitoring of a board-certified practicing physician is an acceptable quality improvement practice within the medical community for investigating quality issues. For this reason the Appellate Review Committee feels it cannot uphold the recommendation of the MEC in this matter. The Appellate Review Committee strongly recommends

this matter be referred to the Joint Conference Committee for a final recommendation."

99. On November 8, 2005, Dr. Georgopoulos was informed that the Joint Conference Committee "met and concluded that the MEC's recommendation was appropriate based on the facts and that monitoring was an acceptable peer review practice specifically allowed by Article 4.1(A) of the Manual."

\* \* \*

101. Under the MEC's August 10, 2004 and September 23, 2004 recommendations concerning Dr. Georgopoulos, he was not permitted to operate without an observer present.

102. Dr. Georgopoulos has not operated since May 13, 2004. He voluntarily closed his office in October, 2004 and did not renew his malpractice insurance after May, 2005. He has not practiced medicine at St. Elizabeth, or worked as a physician in any capacity since May, 2004.

{¶ 5} On May 3, 2010, the trial court issued its judgment entry, finding that all defendants were "entitled to immunity under the Health Care Quality Improvement Act of 1986." Accordingly, the court granted the defendants' motion for summary judgment and dismissed the case in its entirety.

{¶ 6} On May 27, 2010, Dr. Georgopoulos filed his notice of appeal. On appeal, he raises the following assignments of error:

{¶ 7} "1. The trial court committed prejudicial error in granting the defendants-appellees', Humility of Mary Health Partners' motion for summary judgment based on its opinion that the process that the defendants relied on was done correctly. The court ignored the fact that a case cited by the defendant[s], clearly shows that if the process utilized in the fact-finding process is flawed, the findings will be flawed and invalid.

{¶ 8} "2. The trial court committed prejudicial error in granting the defendants-appellees', Humility of Mary Health Partners' motion for summary judgment based on its opinion that there is no genuine dispute as to any material fact, and that the defendant is entitled to judgment as a matter of law.

{¶ 9} "3. The trial court committed prejudicial error in granting the defendants-appellees', Humility of Mary Health Partners' motion for summary judgment based on its opinion that the defendants are entitled to immunity under the Health Care Quality Improvement Act (HCQIA).

{¶ 10} "4. The trial court committed prejudicial error in granting the defendants-appellees', Humility of Mary Health Partners' motion for summary judgment based on its opinion that the defendants are entitled to immunity under the Health Care Quality Improvement Act (HCQIA) 42 U.S.C. § 11112(a) and the rebuttable presumption clause."

{¶ 11} Pursuant to Civ.R. 56(C), summary judgment is proper when (1) the evidence shows "that there is no genuine issue as to any material fact" to be litigated, (2) "the moving party is entitled to judgment as a matter of law," and (3) "it appears from the evidence * * * that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence * * * construed most strongly in the party's favor." A trial court's decision to grant summary judgment is reviewed by an appellate court under a de novo standard of review. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241. A de novo review requires the appellate court to conduct an independent review of the evidence before the trial court without deference to the trial court's decision. *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153.

{¶ 12} The trial court granted summary judgment in favor of the defendants on the basis that they were entitled to immunity under the federal Health Care Quality Improvement Act. According to the Act:

If a professional review action * * * of a professional review body meets all the standards specified in section 11112(a) of this title, * * *

(A) the professional review body,

(B) any person acting as a member or staff to the body,

(C) any person under a contract or other formal agreement with the body, and

(D) any person who participates with or assists the body with respect to the action, shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action.

Section 11111(a)(1), Title 42, U.S.Code.

{¶ 13} The "standards" referred to in the Act are described as follows:

For purposes of the protection set forth in section 11111(a) of this title, a professional review action must be taken—

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3). A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 411(a)

[42 USCS § 11111(a) ] unless the presumption is rebutted by a preponderance of the evidence.

Section 11112(a), Title 42, U.S.Code.

■ {¶ 14} Immunity under the Health Care Quality Improvement Act "is a question of law for the court to decide and may be resolved whenever the record in a particular case becomes sufficiently developed." *Bryan v. James E. Holmes Regional Med. Ctr.* (C.A.11, 1994), 33 F.3d 1318, 1332.

■ {¶ 15} In the context of a summary-judgment motion, the presumption of immunity means that "the *plaintiff* bears the burden of proving that the peer review process was *not* reasonable." (Emphasis sic.) *Bryan* at 1333. "That is, the plaintiff must demonstrate that one of the requirements for immunity was not met." *Fox v. Parma Community Gen. Hosp.*, 160 Ohio App.3d 409, 2005-Ohio-1665, 827 N.E.2d 787, at ¶ 56; cf. *Austin v. McNamara* (C.A.9, 1992), 979 F.2d 728, 734 ("might a reasonable jury, viewing the facts in the best light for [the plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of [section] 11112(a)?").

■ {¶ 16} In his first assignment of error, Dr. Georgopoulos argues that the defendants did not have an objective, reasonable belief that their actions were taken in the furtherance of quality health care. In particular, Dr. Georgopoulos asserts that the purported reasons for review of his surgical performance, the length of operating times and excessive use of blood products, are not measures of healthcare quality. Dr. Georgopoulos relies on a letter of Dr. Gillinov, written after Dr. Sun had reviewed ten of his CABG cases, which states: "The primary measures of outcome related to CABG are survival and freedom from major cardiac events (MACE), including myocardial infarction. * * * Speed of operation and blood loss, while measurable, do not constitute the major variables when assessing outcomes of CABG." Dr. Georgopoulos also relies on the deposition testimony of his expert witness, Dr. Norman A. Silverman, who stated: "How long your operative time is not usually a quality assurance indicator that is used by STS or other people or other review committees, it's outcomes and someone may intuit that it is an outcome predictor, but that's not necessarily true, and you can't use it as a surrogate, you have to use objective outcomes that are accepted and are compared between institutions."

{¶ 17} Dr. Georgopoulos has failed to rebut the presumption that the defendants undertook the professional-review action in the reasonable belief that it was in the furtherance of quality health care.

{¶ 18} As an initial matter, while Dr. Georgopoulos's witnesses stressed the importance of outcomes, the scope of "quality health care" encompasses more than a physician's mortality and morbidity rates. "The fact that [a] Plaintiff

achieve[s] good patient outcomes does not mean that he was not creating unnecessary risks for those patients or for other patients." *Pierson v. Orlando Health,* M.D.Fla. No. 6:08–cv–466–Orl–28GJK, 2010 WL 4341354, at *56. As another federal court has recognized, the purpose of the Quality Improvement Act is "to prevent patient harm, not to assure an adequate response after it occurred." *Singh v. Blue Cross/Blue Shield of Massachusetts, Inc.* (C.A.1, 2002), 308 F.3d 25, 38; *Leal v. Secy., United States Dept. of Health & Human Servs.* (C.A.11, 2010), 620 F.3d 1280, 1286 (a physician's conduct, "although not resulting in any known harm to a patient, is conduct that 'could affect adversely' patient health or welfare").

{¶ 19} Turning to the record before us, the evidence objectively demonstrates that the defendants' initiation of the professional review process furthered quality health care. Dr. Georgopoulos's expert, Dr. Silverman, testified in his deposition that "blood usage" is an indicator that can trigger the peer review/quality assurance process: "Transfusion of blood products * * * is one of the quality indicators that I have been associated with fairly often." Dr. Silverman further testified: "Dr. Georgopoulos had a large number of transfusions. * * * [H]is transfusion requirements were up in that subset higher. The transfusion requirements also should be risk adjusted, but even with risk adjustment, I will concede that—not concede, but it's fact, it's evident that his transfusions were high."

{¶ 20} Dr. Silverman also testified that the 22 hours and 45 minutes spent operating on Patient A was an "inordinate period of time," which is "going to trigger an investigation and appropriately should trigger an investigation, I will agree with that."

{¶ 21} The defendants addressed these circumstances by submitting the cases of Patients A and B to Dr. Sun, a heart surgeon unaffiliated with St. Elizabeth Medical Center. Dr. Sun noted that "the most eye opening aspects of these cases are related to the long intraoperative times which certainly can translate to increases in bleeding as well as increases in postoperative morbidity." Dr. Sun continued, "The operative times and blood loss for these two cases are a standard of deviation or two above what would be the norm. I think this should be looked into further."

{¶ 22} The fact that Dr. Georgopoulos's operating times and blood use may have been justified or may have been consistent with the STS data for St. Elizabeth does not negate the fact that the professional-review process in the present case was objectively justified by these indicators.

{¶ 23} Dr. Georgopoulos further argues that the defendants' actual motivation for initiating the professional-review process was a desire to improve "the STS statistics and the hospital's image, in order to attract more patients." However,

this court, as well as other state and federal courts, has held that the test to determine whether the professional-review actions were taken in the reasonable belief that the actions were in the furtherance of quality health care is an objective test, in which the defendants' subjective motivations are immaterial. *Moore v. Rubin*, 11th Dist. No. 2001–T–0150, 2004-Ohio-5013, 2004 WL 2803237, at ¶ 25; *Bryan*, 33 F.3d at 1323 ("The legislative history of [Section 11112(a), Title 42, U.S.Code] indicates that the statute's reasonableness requirements were intended to create an objective standard of performance, rather than a subjective good faith standard"); *Sugarbaker v. SSM Health Care* (C.A.8, 1999), 190 F.3d 905, 914 ("the circuits that have considered the issue all agree that the subjective bias or bad faith motives of the peer reviewers is irrelevant").

{¶ 24} The first assignment of error is without merit.

{¶ 25} In the second assignment of error, Dr. Georgopoulos argues that the trial court erred in its interpretation of Civ.R. 56's standard of review. Dr. Georgopoulos states that in order to defeat a motion for summary judgment, "a Plaintiff must demonstrate evidence of an objective nature that could be used to defeat the presumption that the review board was acting in the reasonable belief that it was furthering the goal of quality health care."

{¶ 26} Dr. Georgopoulos misstates the summary-judgment standard of review in the context of the Health Care Quality Improvement Act. As set forth above, the issue of immunity under the Act is a question of law in which the professional-review body is entitled to a rebuttable presumption of immunity. A plaintiff must demonstrate by a preponderance of the evidence, rather than evidence of an objective nature, that the review body is not entitled to immunity. In its judgment entry, the trial court set forth the appropriate standard, consistent with this court's opinion, and applied it accordingly.

{¶ 27} The second assignment of error is without merit.

{¶ 28} In his third assignment of error, Dr. Georgopoulos asserts that the defendants failed to afford him "adequate notice and hearing procedures," as mandated by Section 11112(a)(3), Title 42, U.S.Code. Pursuant to the procedures outlined in the statute, "the physician involved must be given * * * a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body" and "has the right * * * to call, examine, and cross-examine witnesses." Section 11112(b)(2)(B) and (b)(3)(C)(iii), Title 42, U.S.Code.

{¶ 29} Dr. Georgopoulos maintains that the defendants provided him with a list of witnesses who were expected to testify before the Medical Executive Committee that included Dr. Cavarocchi. However, Dr. Cavarocchi never appeared to testify. Dr. Georgopoulos contends that his "conspicuous absence" deprived him

of the right "to call, examine, and cross-examine witnesses" and "might have changed the course of all the events that followed." We disagree.

{¶ 30} The right to call and examine witnesses belongs to and must be exercised by the physician involved in the professional-review action. If Dr. Georgopoulos believed that Dr. Cavarocchi's testimony was essential to the Medical Executive Committee's determination, it was his responsibility to summon him as a witness. Dr. Georgopoulos does not have the right to require the professional-review body to summon witnesses on his behalf. The right to cross-examine witnesses would become operative only if Dr. Cavarocchi had appeared to testify on behalf of the defendants. Because he did not appear, the right to cross-examine did not become operative.

{¶ 31} Dr. Georgopoulos further argues that he was deprived of a hearing before persons who were not "in direct economic competition" with him, to which he was entitled by Section 11112(b)(3)(A)(ii) and (iii), Title 42, U.S.Code. Dr. Georgopoulos asserts that the hospital was the entity that was in direct competition with him. According to Dr. Georgopoulos, St. Elizabeth "was in the process of setting up an 'in house' team of cardiologists" with which independent cardiologists, such as himself, were in competition. We disagree.

{¶ 32} According to uncontradicted affidavit testimony, none of the physicians comprising the investigating committee were in direct competition with Dr. Georgopoulos. Dr. Jakubek was an independent anesthesiologist who, like Dr. Georgopoulos, was not employed by St. Elizabeth. Dr. Abdu was a retired general surgeon, and Dr. Hayek was an internist. Because none of these persons were in direct economic competition with Dr. Georgopoulos, there was no violation of the notice and hearing procedures set forth in the Health Care Quality Improvement Act. Assuming arguendo that Dr. Georgopoulos was in direct competition with cardiologists employed by St. Elizabeth, such as Dr. Cavarocchi, this fact does not render the professional-review action taken in the present case unreasonable. In its recommendation that Dr. Georgopoulos be monitored, the investigating committee found that both Dr. Sun and Dr. Gillinov agreed that the extended arteriotomies and double-suturing, which were a part of Dr. Georgopoulos's personal technique, "are usually unnecessary and may prolong operative time and potentially result in the observed increased blood loss."

{¶ 33} The third assignment of error is without merit.

{¶ 34} In his fourth and final assignment of error, Dr. Georgopoulos argues that the presumption of reasonableness in the proceedings was rebutted by the following: he faced having his privileges summarily suspended if he did not voluntarily refrain from coronary-artery-bypass surgeries; Dr. Waldman and the defendants' attorneys were present at meetings of the investigating committee

without notice to him; Dr. Waldman advised him that he would be sending ten cases to Dr. Sun for review, but initially sent only two; and the defendants submitted a report on Dr. Georgopoulos to the National Practitioner Data Bank prior to the medical executive committee initiating a formal investigation of his clinical competence.

{¶ 35} Dr. Georgopoulos provides no argument and cites nothing in the record to support his claims that these actions rendered the proceedings against him unreasonable. Accordingly, his conclusory assertions are unpersuasive.

{¶ 36} The fourth assignment of error is without merit.

{¶ 37} For the foregoing reasons, the judgment of the Trumbull County Court of Common Pleas, granting summary judgment in favor of defendants-appellees, Humility of Mary Health Partners, Dr. Waldman, and Dr. Cavarocchi, on the grounds that they were entitled to immunity under the Health Care Quality Improvement Act, is affirmed. Costs are taxed to appellant.

Judgment affirmed.

CANNON, P.J., and WRIGHT, J., concur.